**HUMBLE OIL & REFINING COMPANY, a Delaware Corporation, Plaintiff,**

**v.**

**LOCAL UNION 866, Affiliated with International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, a labor organization, Defendant.**

**No. 67 Civ. 116.**

United States District Court,
S. D. New York.

Sept. 29, 1970.

Wolf & Burrell, New York City, for plaintiff; William L. Dill, Jr., Newark, N. J., of counsel.

Guazzo Silagi & Craner, New York City, for defendant; Caesar C. Guazzo, New York City, of counsel.

## OPINION

COOPER, District Judge.

This is an action instituted by plaintiff Humble Oil & Refining Company (Humble) to vacate [1] the November 18, 1966 labor arbitration award of a three member Board of Arbitration on the ground that the question submitted to and decided by the arbitrators in favor of defendant Local Union 866 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Union) was not arbitrable. This Court has jurisdiction pursuant to 29 U.S.C. § 185 and 9 U.S.C. § 10.

After a two day trial conducted on March 12 and 16, 1970 before this Court sitting without a jury, we reserved decision. The following opinion constitutes our findings of fact and conclusions of law pursuant to Rule 52, F.R.Civ.P.

### The Two Agreements

On January 22, 1965 a three month strike at Humble's Bayway Refinery, New Jersey was terminated; Humble and the Union thereupon entered into both a collective bargaining agreement (Contract) and a Special Agreement.

The Special Agreement was executed "to provide procedures for returning employees to work at the end of the strike that has been taking place at the Company's Bayway Refinery including provisions for handling a special early retirement and layoff program." Plaintiff's exhibit 1 in evidence, p. 1. The Special Agreement therefore concerned two interrelated problems facing the parties: I. handling of a reduction in the total number of employees in view of Humble's notice to the Union "that a surplus of no more than 325 employees exists in the bargaining unit * * *" and II. return of the remaining employees to work after the strike. *Id.*

With respect to Part I thereof, voluntary resignation or retirement was promoted in order to reduce the number of involuntary layoffs as much as possible. To effectuate this end, the Special Agreement established an early retirement and voluntary resignation program with a cut-off date for electing its benefits of January 22, 1965 (the effective date of the Contract). In the event that voluntary terminations were insufficient and involuntary layoffs became necessary, the Special Agreement provided a schedule of severance allowances (at the same rate offered to those who elected to voluntarily resign—at least $7500 —an amount considerably above that provided by the Contract).

By virtue of the three hundred twenty-five maximum reduction, the maximum number of employees who could be involuntarily laid off was directly dependent upon the number of voluntary retirements or resignations received and, further, upon an evaluation of the qualifications of those returning for the jobs available. Accordingly, the Special Agreement, while requiring notification of the possibility of layoff as soon as practicable, allowed Humble to delay final decision on involuntary layoffs until after the number could be accurately ascertained:

4. * * * It is recognized by the parties, however, that the number and names of employees to be laid off cannot be determined with accuracy until the number of employees who elect early retirement and voluntary terminations is known and until the determination is made, as provided below, of the number of employees who are qualifiable to fill the available jobs vacated by junior laid off employees.

---

1. Plaintiff's complaint sought modification of the arbitrators' award as an alternative, on the ground of excessiveness. Following Judge Bonsal's rejection of this contention in an opinion dated July 20, 1967 and reported at 271 F.Supp. 281, 284 (S.D.N.Y.), plaintiff did not press this issue at trial, although it states its desire to "preserve its rights respecting the question." See Plaintiff's Post-Trial Brief, received in chambers May 13, 1970, footnote p. 1.

* * * * * *

7. The names of the individuals to be laid off shall be determined as soon as practical after the effective date of the collective bargaining agreement, and each individual to be laid off shall be so notified by the Company after the Company determines that the individual will be included in the laid off employees. Inasmuch as the final determination of the individuals to be laid off cannot be determined until after the completion of the evaluation period * * * (i. e. whether certain employees are qualifiable to replace junior employees cannot be determined until that time), the Company shall not be required to designate the individuals to be laid off under this special agreement until after that date [not more than seven weeks from January 25, 1965—March 15].

Plaintiff's exhibit 1, pp. 2, 7.

As to the order of layoff among the employees not electing to terminate, the Special Agreement left this to the Contract:

5. The designation of employees to be laid off shall be made in accordance with the collective bargaining agreement. *Id.* at 2.

With regard to recall rights for any employees thus laid off the Special Agreement merely stated:

* * * for the purpose of recall rights, all employees laid off pursuant to the provisions contained herein shall be considered as having been laid off on the same date, namely January 25, 1965. *Id.* at 4.

With respect to Part II of the Special Agreement and returning the remaining employees to work after the strike, the only portion of that agreement here relevant provided:

1. In recognition of the fact that it is not practical to resume normal operations immediately upon the effective date of the collective bargaining agreement, the Company and the Union have agreed that employees shall be returned to work as soon as practical after the effective date of the collective bargaining agreement and in accordance with seniority wherever practicable * * *. In no case shall any employee be recalled more than 14 days [February 8] from the effective date of this agreement [January 22]. *Id.* at 5.

The Contract executed the same date as the Special Agreement provides that seniority governs the order of any layoff. Plaintiff's exhibit 3 in evidence, Article 34–2, p. 43. A "layoff" is defined as "the termination of an employee whose services are no longer required because of lack of work." *Id.*, Article 34–1.

The Contract requires six months notice of layoff and provides a severance allowance. *Id.*, Article 34–4, p. 44. In addition to severance allowances, employees have recall rights under the Contract:

30–1 Rehire

An employee who is laid off for lack of work has preference for rehire, provided he is qualified, for a period of time equal to his Bayway Refinery service (at the time of his layoff) or one year, whichever is shorter * * *

Before a permanent or temporary assignment is offered to a new hire, it shall be offered to qualified laid off employees having preference for rehire in the order of the longest Bayway Refinery service. To be qualified for rehire is to be qualified for the assignment for which the rehire is being made.

*Id.* at 38–39.

Finally, Articles 21 and 22 of the Contract provided for arbitration of grievances by a three member board consisting of one impartial chairman, as well as one member selected by the Union and one by Humble. Article 21–2 de-

fines a grievance as "a claim by an employee or the Union that the Company has violated an express provision of this Contract."

### The Underlying Dispute

By January 22, 1965, the date the strike ended and the agreements were signed, one hundred fifty-five employees had elected to retire or resign voluntarily. Tr. 27.[2] Humble estimated there would be another sixty to seventy additional voluntary terminations. Tr. 29. Based on these figures Humble projected that it could lay off as many as one hundred to one hundred ten employees from the bargaining unit and still be within the maximum reduction of three hundred twenty-five employees agreed upon. That night Humble telegraphed over one thousand employees informing them to return to work starting January 25. See Plaintiff's exhibit 29 in evidence, Arbitration Award, Opinion of Chairman, November 16, 1966, p. 7.

On January 23, Humble issued four letters, each to a separate group of its three hundred twenty-five hourly wage employees who had not received the telegram to return to work, setting forth the status of the members of each group:

(1) a letter to the 77 hourly wage workers who had accepted early retirement asking them to appear on January 28 to sign retirement papers, turn in identification badges, car passes, Coast Guard passes, and Esso credit cards and pick up their personal things from their lockers (Plaintiff's exhibit 29, p. 8);

(2) a similar letter to the 78 who had voluntarily resigned, setting January 27, as their date to come in (Id.);

(3) a letter to 64 workers stating in part:

* * * There is a possibility that additional trainees will be required due to either voluntary resignations or failure of employees to qualify in the Training Program. In the next 14 days we expect to be able to let you know whether you will be asked to enter the Training Program or laid off because of your low seniority. We regret having to be indefinite at this date, but want to maintain every employment possibility for persons such as yourself * * *.

(4) a letter to the 106 wage employees with the lowest seniority reading in part as follows:

Dear Fellow Employee:

As we have announced in letters and the public press, Bayway Refinery has a present surplus of 325 wage employees and 40 salaried represented employees * * * To insure the future security of Bayway, it is necessary to lay off junior employees.

This letter is to inform you that you are a junior employee and you will be laid off. We regret the necessity of this action and have given considerable thought on how to assist you as much as possible. Special Severance allowances have been developed with your union, and will be paid to you at the time you sign your termination papers. Attached is a schedule of the severance pay which you will be eligible to receive which we hope will assist you and your family.

The Company will open a special guidance office * * * to assist you in finding other employment * * *.

In order to arrange for termination of your annuity and thrift benefits, we are setting up a series of special meetings in the Bayway Cafeteria. We would like you to come through the main gate at [January 26]. Please bring your identification badge, car pass, Coast Guard pass

---

2. "Tr." followed by a number refers to pages of the trial transcript.

(if any) and Esso credit cards. You will be able to pick up your personal things from your locker after this meeting. \* \* \*

Your services were greatly appreciated during the period when our past full complement was needed to cover the requirements of the refinery. In your future endeavors we wish you well, and if we can assist you please contact us.

Defendant's exhibit A in evidence.

On January 22 Humble agreed to extend the deadline for employees to accept early retirement or resign, but no specific date was fixed. Plaintiff's exhibit 29, p. 7. The following day Humble informed its management personnel that the deadline was extended to January 27. *Id.* at 7–8. On January 25, the Union announced that the deadline had been extended to January 30. *Id.* at 9. On January 26, Humble announced to its employees that January 27 was the deadline. *Id.* In the meantime and in accordance with Humble's letter of January 23, the one hundred six employees to be laid off appeared on January 26, turned in their credentials, signed their termination papers and received their severance allowance checks. *Id.*

Between January 27 and February 1 Humble and the Union met to resolve the confusion occasioned by the conflicting announcements as to the date of the deadline. *Id.* at 10. During this interim the sixty-four employees in limbo were notified to return to work on February 1. *Id.* On February 1, Humble agreed to extend the deadline to February 5, but informed the Union that because of this further extension more voluntary terminations had been and would be received than had been anticipated. *Id.* Thus, Humble informed the Union that as a result certain employees on layoff would have to be called back to work and return their severance pay. *Id.*

The recall commenced February 1 in order of seniority. *Id.* A laid off employee was told that to return to work he would have to return his severance allowance. *Id.* If he refused, the position was offered to the employee next in line on the recall list. *Id.* A total of fifty employees on layoff were contacted of whom twenty-eight agreed under protest to resume work and return their allowances. *Id.* at 11. On February 8, the Union protested Humble's position of requiring return of severance pay. *Id.*

*Prior Proceedings*

The Union demanded arbitration under the arbitration provisions of the Contract and submitted the following issue for determination by the Board of Arbitration:

Did the company violate the agreement between the parties in requiring the return of severance allowance from employees laid off and recalled to work? If so, what shall the relief be?

At the outset of the hearings which were conducted before the Board of Arbitration over a period from July 1965 to March 1966, Humble contended that the issue presented was not arbitrable because only the action taken under the Special Agreement was in dispute and the parties had not agreed to arbitrate disputes thereunder. Without then reaching the issue of whether or not either the Special Agreement or the Contract had been violated, the Board decided that "the issue was arbitrable and that the Special Agreement was enforceable through the grievance and arbitration provisions of the Contract." *Id.* at 5.

After an exhaustive presentation of evidence by both parties on the merits of the dispute covering many hundreds of pages of transcript (Defendant's exhibit D–4 in evidence), the Board on November 18, 1966 rendered its award (the Company member dissenting) that, so far as is relevant here, "the Company violated the agreement between the parties in requiring return of severance al-

lowances from employees laid off and recalled to work." [3]

■ This action by Humble to vacate the arbitrators' award was commenced January 11, 1967. In disposing of cross-motions by Humble and the Union for summary judgment, Judge Bonsal on July 20, 1967 ruled that "[i]t does not appear that the Company and the Union agreed to leave the question of arbitrability to the Board * * *." Humble Oil & Refining Co. v. Local Union 866, 271 F.Supp. 281, 284 (S.D.N.Y.) (citations omitted). Where the claim is made that the parties vested in the arbitrator exclusive power to decide the issue of arbitrability "the claimant must bear the burden of a clear demonstration of that purpose." United Steelworkers of America v. Warrior & Gulf Nav. Co., 363 U.S. 574, 583 n. 7, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960). This the Union has failed to show.

The Union's contention that Humble waived judicial determination of the issues of arbitrability was also presented to Judge Bonsal who held:

* * * the Company did not waive its right to a judicial determination of the question of arbitrability by participating in the arbitration proceedings on the merits. * * * A finding of waiver from the Company's participation in arbitration would conflict with the policy favoring judicial review after an arbitration award has been made so that "the court receives the benefit of the arbitrator's interpretive skills as to the matter of his contractual authority." Humble Oil & Refining Co. v. Local Union 866, *supra*, 271 F.Supp. at 284–285 (citations omitted).

No facts sufficient to support a finding of waiver were adduced at trial.

### Arbitrability

Humble's sole contention is that the dispute submitted to the arbitrators was not arbitrable and the "arbitrators exceeded their powers" because the grievance in question concerns only the Special Agreement; further neither the Special Agreement nor the Contract expressly or impliedly call for the arbitration of disputes thereunder. Plaintiff's Post-Trial Brief, received in chambers May 13, 1970, p. 16. Cf. 9 U.S.C. § 10.

■ The duty to arbitrate and its extent are questions for the Court to decide on the basis of the contracts entered into by the parties. See Torrington v. Metal Products Workers Union, 347 F.2d 93, 96 (2d Cir. 1965). This issue is wholly contractual and Humble cannot be compelled to arbitrate the within dispute in the absence of a binding arbitration clause covering the issues in question. *Id.*

■■ It is also clear, however, that we may not under the guise of determining arbitrability review the merits of the award. See United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 569, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); Steelworkers v. Warrior & Gulf, *supra*; United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). The power of a court to vacate an arbitration award is limited to the question whether the arbitrator exceeded the limits of his contractual authority:

When an arbitrator is commissioned to interpret and apply the collective bargaining agreement he is to bring his informed judgment to bear in order to reach a fair solution of a problem. * * * Nevertheless, an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective

---

3. Other portions of the award, not here challenged, were (1) repayment of the severance pay with interest to the 28 men who returned to work and (2) denial of the claims of the men who were recalled but who declined to return to work.

bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award. United Steelworkers of America v. Enterprise Wheel & Car Corp., *supra* at 597, 80 S.Ct. at 1361.

### The Arbitrators' Decision

The opinion of the Board of Arbitration's Impartial Chairman Arthur Stark thoroughly and, we believe, correctly analyzes the dispute in issue and concludes that the issue presented involves an interpretation of an express provision of the Contract itself not resolved exclusively by the Special Agreement. While looking to many sources for guidance as to the proper interpretation, his opinion clearly shows that the award "draws its essence from the collective bargaining agreement." Thus, this dispute is arbitrable without regard to the further issue of whether, in any event, disputes involving only the Special Agreement would be subject to arbitration as well.

After a fair presentation of the position of the respective parties, Chairman Stark states:

> At the heart of this dispute is the question of layoff. First, we must ask: were the grievants in fact laid off? If so, under what contractual provisions? And second, what were their recall rights? After answering these questions, we can evaluate Management's action in recouping severance allowances.

Plaintiff's exhibit 29, p. 13.

It is his opinion that the testimony clearly shows that the one hundred six men, including those later called back to work, were in fact laid off and their employment terminated on January 26, 1970. *Id.* at 13–14. Further, he found that Humble had "definite leeway in making its final layoff decisions" and that it must be held responsible for the consequences of its decision to make layoff determinations "on January 23,

one day after the agreement was consummated particularly in light of its clear and unequivocal right to delay such decision until all relevant facts could be ascertained." *Id.* at 14–15.

Having specifically found that Humble's action constituted a layoff, he reached the crucial issue: "What then were the recall rights of employees laid off in accordance with the terms of the Special Agreement?" *Id.* at 15. The only relevant portion of the Special Agreement merely declares:

> * * * for the purpose of recall rights, all employees laid off pursuant to the provisions contained herein shall be considered as having been laid off on the same date, namely January 25, 1965.

Plaintiff's exhibit 1, p. 4. He therefore gives it as his opinion: Significantly, there is nothing in the Special Agreement itself which defines recall rights. Had the parties desired, they could have written in their intentions for the purpose of this special situation; but there is no evidence that they considered this necessary.

To find recall rights, then, we must turn to the basic contract, Article 30–1, quoted * * * above. In accordance with this Article, the 106 laid off men had recall rights for a year following January 25, 1965.

Were these men under any obligation to return severance allowances if recalled in the year following layoff? The Company does not contest the fact that for the majority (i. e., those not recalled in early February) no such obligation existed. And the record is clear that, under prior contracts containing this same recall provision, employees were never required to return severance allowances. Moreover, the evidence discloses that this very question was discussed at 1964–65 negotiations and the past practice acknowledged by Management.[4] In

---

4. In this regard, Chairman Stark specified earlier in his opinion the evidence showing that during the 1964–65 contract negotiations the parties had discussed whether

light of these discussions and the fact that no provision for returning severance allowances upon recall was written into either the Special Agreement or the basic contract, it must be found that the parties' mutual intent was to continue the former practice.

Plaintiff's exhibit 29, pp. 15–16 (footnote omitted).

Chairman Stark then determined that there were no compelling reasons for treating those employees recalled in early February "differently from their fellows who were laid off at the same time, under the same circumstances, and in accordance with the same agreement." *Id.* at 16.

He then disposed of two arguments which Humble urges again before us:

In light of the above considerations, the fact that the recalled men were accorded their former status after they returned to work cannot be deemed determinative of the basic contractual issue. It is clear, in any event, that the contract itself sets forth the manner in which a man recalled from lay-off of less than thirty days is to be treated with respect to seniority, job placement, fringe benefits, and the like.

With regard to the arguments concerning "equity" and "fair dealing," it is of course true that the Company was not obligated to extend the deadline for resignations or retirements beyond January 22. And it could have placed 170 men—rather than 64 —on the "suspense" list. While its motivation in extending the deadline and in minimizing the size of the "suspense" list may have been praiseworthy, nevertheless the rights of laid off employees have to be determined by reference to the contractual commitments in the Special Agreement and basic contract.
*Id.* at 17.

### Humble's Argument

Humble's argument is almost wholly directed to whether or not the Special Agreement is subject to arbitration. For the initial prerequisite that only the

a recalled employee would have to return his severance allowance and that they were in basic agreement he would not:

Mr. H. J. Gibsons, I. B. T. International Vice President, recalled that Company spokesman T. J. Innes, Manager of the Bayway Refinery, had stated that: (1) in the past the Company had never asked people for money back once they had received it and been called back from layoff; (2) if men were recalled they would not be expected to repay the allowance, regardless of whether they were recalled within one day or within two weeks of their layoff; and (3) "in response to our warnings that if they are hired back the next day, they kept their severance pay."

Mr. W. F. Genoese, I. B. T. International Representative, who was Mr. Gibbons' assistant at negotiations, testified in substance that Refinery Manager Innes said that, if it became necessary to recall some people, the Company was willing to pay the penalty of not requiring the return of severance allowance, even if the recall took place "a day, a week, a month or a year" following layoff.

Mr. J. J. Graham, Employee Relations Manager of the Refinery, who also participated in these negotiations, testified that there was no reference to "an hour, a day, a week, a month" or anything like that. However, he recalled that Management made the points that, (1) "when a person was laid off and recalled, we had not required him to return his severance allowance," (2) Mr. Innes had stated that this had always been Company policy; and (3) "under normal conditions" a recalled worker would not have to return severance allowance regardless whether he recalled within one day, two months or six months.

Although not recalling the "one day, one week, one month" reference, Mr. Innes testified that the question of whether recalled men would have to return severance allowances "came up for considerable discussion, because Mr. Gibbons expressed surprise that it was the practice at Bayway to pay a man severance allowance when he is laid off and still give him recall rights * * * We told him that our intentions were in this case, as they had been in prior layoffs where people were paid severance allowance, that they would still have recall rights."
Plaintiff's exhibit 29, footnote p. 6.

Special Agreement be in dispute and not any express provision of the collective bargaining Contract, it relies principally if not exclusively upon Torrington v. Metal Products Workers Union, 347 F.2d 93, 95 (2d Cir. 1965), wherein our Circuit held:

> Controversies concerning recall to work after a strike are not prima facie, at any rate, grievances "with respect to the interpretation or application" of any of the provisions of the usual collective bargaining agreement. And the collective bargaining agreement between the parties to the present case contains no provisions which expressly relate to the recall of strikers. Provisions of the collective bargaining agreement are not directly relevant to recall of strikers. In order to apply them to this situation for which they were not designed they must be adapted or selected by analogy. If, therefore, the collective bargaining agreement, including the arbitration clause, is applicable to the recall grievances it must be because there is some special agreement making it applicable or because of some custom or common understanding which has that effect.

We believe *Torrington* is to be distinguished, however, not only because here we have had the benefit of the "interpretive skills" of the arbitrator who found the Contract's recall provisions applicable, but because the issue there was whether the provisions of the usual collective bargaining agreement expressly related to the "recall of strikers." The Court held that they did not. However, we are not here concerned with "the recall of strikers" but with the recall of former employees who had been laid off by Humble in the course of reducing the size of its work force following the termination of the strike. As previously set forth, the "recall of strikers" or the "return to work of employees after end of strike" is dealt with in Part II of the Special Agreement. Yet, to the extent the Special Agreement deals at all with recall of an employee on layoff, the only provision touching thereon is found, not in Part II, but in Part I thereof: "early retirement and layoff procedures."

Humble in essence contends that since the Special Agreement establishes the special severance allowance, its provisions alone are determinative of any questions which may arise concerning such allowance including the issue of its return 'upon 'recall to work. We disagree. The issue in dispute as presented to and determined by the arbitrators is whether recall rights may be conditioned upon the return of severance pay. Once the employees were laid off and paid their severance allowance the terms and coverage of the Special Agreement were exhausted. Recall rights and conditions are expressly and exclusively governed by Article 30 of the Contract. Nothing in the Special Agreement, aside from a provision recognizing the existence of such rights and establishing a uniform date for all layoffs, deals with this issue. Nothing to the contrary was developed at trial. We are constrained to declare the testimonial evidence at trial on the part of both parties (especially the Union) unimpressive on the issue before us.

The arbitrators were not deprived of authority to resolve this dispute involving an express Contract provision (the sole criterion set forth in the Contract defining arbitrable subjects) by virtue of Humble's position (by way of defense) that the Special Agreement must be read to include an implied right to rescind a layoff in light of its obligation not to terminate the employment of more than three hundred twenty-five employees. Having been presented by Humble with this argument as to why the express Contract provisions for recall should not apply here to the twenty-eight employees whose recall was necessitated by the provision limiting the permissible reduction in the work force,

the arbitrators were of necessity required to interpret the Special Agreement.

■ The arbitrators' interpretive skills must be given great weight here where the determination of arbitrability appears to be almost inextricably entwined with the merits of this dispute. Cf. United Steelworkers of America v. Warrior & Gulf, *supra*, 363 U.S. at 585, 80 S.Ct. at 1354. We cannot find that the arbitration award was not premised on construction of the Contract. See United Steelworkers of America v. Enterprise Wheel, *supra*, 363 at 598, 80 S. Ct. 1358. As we see it, this is a question of interpretation, construction and application of the contract reserved to the arbitrator:

> [T]he question of interpretation of the collective bargaining agreement is a question for the arbitrator. It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his. United Steelworkers of America v. Enterprise Wheel, *supra* at 599, 80 S.Ct. at 1362.

### Other Issues

We need not and do not reach the question of whether this dispute would be subject to arbitration if it concerned only the provisions of the Special Agreement; nor the various other contentions pressed by the Union upholding the award.

### Conclusion

Accordingly, for the reasons set forth above, the Clerk is directed to enter judgment for the defendant Union and against the plaintiff Humble on each of the three causes of action herein.

So ordered.