447 F.2d 229
 78 L.R.R.M. (BNA) 2123, 66 Lab.Cas. P 12,001
 HUMBLE OIL & REFINING COMPANY, a Delaware corporation,
Plaintiff-Appellant,
v.
LOCAL 866, affiliated with INTERNATIONAL BROTHERHOOD OF
TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF
AMERICA, a labor organization, Defendant-Appellee.
 No. 850, Docket 35667.
 United States Court of Appeals, Second Circuit.
 Argued June 14, 1971.
Decided Aug. 23, 1971.
 
 Frederick T. Shea, New York City (Lester L. Cooper, Jr., New York City, of counsel; Kelley, Drye, Warren, Clark, Carr & Ellis, New York City, on the brief), for plaintiff-appellant.
 Caesar C. Guazzo, New York City (Stephen E. Klausner, New York City, of counsel; Guazzo, Silagi & Craner, P.C., New York City, on the brief), for defendant-appellee.
 Before KAUFMAN, FEINBERG and TIMBERS, Circuit Judges.
 IRVING R. KAUFMAN, Circuit Judge:
 
 
 1
 This is an appeal from the dismissal after trial of plaintiff Humble Oil & Refining Company's action brought under Section 301 of the Labor Management Relations Act, 29 U.S.C. 185, to vacate or modify an arbitration award in favor of defendant Teamsters Local 866. The issues raised concern the scope of the Board of Arbitration's powers under the applicable collective bargaining agreement. We agree with Judge Bonsal below, who denied Humble's motion for summary judgment, D.C., 271 F.Supp. 281, and with Judge Cooper who in a decision after trial, D.C., 321 F.Supp. 374, found that the Board acted within the scope of the arbitration clause contained in that bargaining agreement.
 
 I.
 
 2
 The relevant facts are not in dispute. The collective bargaining agreement in question ('the contract') was executed January 22, 1965, at the conclusion of a three-month strike at Humble's Bayway Refinery, New Jersey. Articles 21 and 22 of the contract provided for arbitration by a three-member Board of any 'grievance,' defined as 'a claim by an employee or the Union that the Company has violated an express provision of this agreement.'
 
 
 3
 On the same day as the parties concluded the bargaining contract, they also signed a so-called Special Agreement designed by its own terms 'to provide procedures for returning employees to work at the end of the strike * * * including provisions for handling a special early retirement and layoff program.' The Agreement contained an arbitration provision conceded by the Union to be irrelevant to the present dispute.
 
 
 4
 The Special Agreement established a procedure for reducing the work force at the refinery in conformance with the Company's notice to the Union that 'a surplus of no more than 325 employees exists in the bargaining unit.' Pursuant to the provision of the Agreement, Humble instituted immediately after its adoption a program of combined voluntary and involuntary layoffs to eliminate the surplus. Under the Agreement, each employee laid off received a special severance allowance of at least $7,500, a generous amount in comparison to allowances provided in instances of other 'layoffs' under the contract, defined as 'the termination of an employee whose services are no longer required because of lack of work.'
 
 
 5
 Because Humble subsequently agreed to extend the originally fixed deadline prior to which voluntary resignations would be accepted, it discovered that it had initially laid off involuntarily too many employees and would be required to reinstate some of them. Thus on February 1 the Company began to recall laid-off employees. Ultimately fifty were called and offered reinstatement, but only on condition that they returned their severance pay. Twenty-eight employees accepted the offer after repaying the severance allowance while protesting at the same time that requiring repayment violated the Special Agreement or the contract or both. Twenty-two other former employees refused to accept the Company's condition.
 
 
 6
 The Union then demanded arbitration by the Board of the issue whether the Company violated 'the agreement between the parties in refusing the return of severance allowances * * *.' The question of arbitrability was duly raised by the Company before the three-member Board, which voted two-to-one in the Union's favor on the issue, finding that 'the Special Agreement was enforceable through the grievance and arbitration provisions of the Contract.' Following an extensive evidentiary hearing, the Board then concluded, also by a vote of two-to-one, that the condition of repaying the severance allowances 'violated the agreement between the parties' and accordingly ordered that the Company return the amounts repaid by the reinstated employees with interest.[1]
 
 II.
 
 7
 The Company's primary contention is that the Board's award was grounded in rights and obligations created by the Special Agreement, that the Agreement is not, as the Board held, enforceable through the contract's arbitration clause, and hence that the award is beyond the scope of the Board's powers as delegated to it in the bargaining agreement. We are spared from passing on whether any violation of the Special Agreement would be arbitrable because, as Judge Cooper held, the award 'draws its essence from the collective bargaining agreement,' United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960).
 
 
 8
 The impartial Chairman of the threemember Arbitration Board, who filed a written decision explaining the reasons for his decisive vote, clearly found that the employees' rights were governed by the contract and not by the Special Agreement. The gist of his rationale was that the Agreement defined primarily the procedure for carrying out the special reduction of force but, like a statute whose interstices are filled by pre-existing law, recall rights were inferentially left for the contract to define. Thus, the only reference to recall in the Agreement provided that 'for the purpose of recall rights all employees laid off pursuant to the provisions contained herein shall be considered as having been laid off on the same date * * *.' 'To find recall rights,' the Chairman looked to Article 30-1 of the contract, entitled 'Rehire.' That provision mandates in relevant part that an 'employee who is laid off for lack of work has preference for rehire, provided he is qualified,' meaning 'qualified for the assignment for which the rehire is being made.' The Chairman concluded that the language, purpose, and mechanics governing the special layoff procedure all indicated that recalls following the special layoffs were to be treated as were any other such recalls under the contract.
 
 
 9
 In construing the provisions of Article 30-1 of the contract to determine the employees' recall rights, the Chairman made use of a typical battery of construction techniques, relying especially upon the parties' previous practices under predecessor bargaining agreements and on the bargaining history of the 1965 contract. He concluded that Article 30-1 reflected a 'mutual intent to continue the former practices' under prior similarly worded clauses, permitting laid-off employees to retain severance allowances. In sum, the Chairman found that the laid-off workers 'were entitled to retain (the allowance) under the contract.'
 
 
 10
 Even assuming, as seems inevitable from the above and as we hold, that the Board did in fact interpret the contract, rather than the Special Agreement, to establish a right to retain severance allowances, the Company insists that the arbitrators nonetheless exceeded their powers under the arbitration clause of the contract, contained in Articles 22 and 23, which provide for arbitration whenever there is claimed a violation of 'an express provision' of the contract. The Company maintains that the arbitrators grounded their award in an implied rather than an 'express' provision. Although the arbitration clause here is narrower than arbitration clauses that permit arbitration of 'any dispute arising under the contract,' or 'under any provision of the contract,' or the like, the Board did find that an 'express provision' controlled the dispute, viz. Article 30-1. To determine whether the Company had violated rights intended by the parties to be preserved by the language of that provision, the Board was required to discover the intent of the parties, and to do this it looked to evidence and not merely the cold and cryptic words on the face of the agreement which shed little light on the issue. We see nothing in the arbitration clause which forbids resort to such rudimentary tools of construction. If the Board were barred from resorting to bargaining history and rights established under similar language in past contracts, the parties to the contract would be remitted to securing arbitration only when there was a violation of a provision so plain and unambiguous as to require no collateral evidence of intent-- and we might add hardly requiring arbitration itself. To emasculate the arbitration clause, absent a more clear and definite intent that the parties intended it to have such a wooden effect and to be construed so antiseptically, would be contrary to the well-recognized presumption in labor law favoring private settlement of labor disputes. See United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); United Steelworkers of America v. Warrior & Gulf Nav. Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).
 
 
 11
 Appellant relies heavily on our decisions in International Union of Electrical, Radio and Machine Workers, A.F.L.-C.I.O. v. General Electric Co., 407 F.2d 253 (1968), cert. denied, 395 U.S. 904, 89 S.Ct. 1742, 23 L.Ed.2d 217 (1969), and Torrington Co. v. Metal Products Workers Union Local 1645, 362 F.2d 677 (1966). However, both cases are distinguishable. In the former, the arbitration clause limited arbitration as a matter of right, inter alia, to a 'claimed violation of a specific provision' in the collective bargaining agreement. We said that this meant that the union 'must at least rely on specific language that arguably expressly covers the 'subject' of the grievance.' 407 F.2d at 260. On this basis, we held nonarbitrable two grievances concerning special piece prices because there was no language in the contract which restrained the company in any way with regard to such rates. In this case, however, Article 30-1 does deal with the whole subject of recalls and arguably sets forth the only permissible conditions for it.
 
 
 12
 In Torrington, we found nonarbitrability where an arbitrator had relied on a past unilateral practice of the company which the company had terminated two years before the arbitrated dispute arose. In the negotiations resulting in the applicable agreement in that case, there had been discussion of the possibility of reviving past practice to grant employees time off on election days. But the final agreement itself contained no provision remotely bearing on employee rights for election day time off. Thus, in Torrington, the arbitrator relied not at all on specific language in the collective bargaining agreement. The arbitrators here, however, confronted with an opaque but 'express provision' of the contract governing the rights at issue, sensibly sought clarification in totally relevant evidence beyond the language of the contract.
 
 III.
 
 13
 The Company's final claim is that the arbitrators' award is inconsistent with Article 22-2 of the contract, which denies to the arbitrator 'the power to inflict a punitive award against the Company,' limiting permissible awards to 'a sum of money not to exceed the individual's normal earnings or other premiums he would regularly earn.' But a reasonable construction of this provision would not preclude awards of sums to which, as the arbitrator found in this case, employees have a claim protected by the terms of the contract itself, as opposed to awards of sums not provided for in the contract but inflicted solely to punish the company for its wrong-doing. In thus affirming the arbitrator's resolution of this issue of construction adversely to the company, we are mindful, as was the district court, of the admonition of United Steelworkers of America v. Enterprise Wheel, supra, 363 U.S. at 599, 80 S.Ct. at 1362, that: 'the question of interpretation of the collective bargaining agreement is a question for the arbitrator. It is the arbitrator's construction which was bargained for * * *.'
 
 
 14
 The judgment is affirmed.
 
 
 
 [1]
 The Board also ruled that the twenty-two employees who refused to return to work thereby forfeited their opportunity to be rehired. The Union has not contested this aspect of the award