ATLANTIC & GREAT LAKES STEAMSHIP CORP., Plaintiff-Appellee,

v.

STEELMET, INC., Defendant,

and

Tidewater Terminals, Inc., Defendant-Appellant.

No. 45, Docket 77-7131.

United States Court of Appeals, Second Circuit.

Argued Sept. 28, 1977.

Decided Nov. 21, 1977.

Richard E. Repetto, New York City (Donovan, Maloof, Walsh & Kennedy, New York City, on the brief), for plaintiff-appellee.

Donald F. Mooney, New York City (Eugene J. O'Connor, Jr., New York City, on the brief), for defendant-appellant.

Before LUMBARD, MOORE and FEINBERG, Circuit Judges.

LUMBARD, Circuit Judge:

Tidewater Terminals, Inc. appeals from a judgment of the Southern District which found it liable to plaintiff Atlantic & Great Lakes Steamship Corp. (AGL) for breach of a charter agreement between the two, under which Tidewater contracted to charter the M.V. Mary from AGL, the time-charter owner of the vessel. On appeal, Tidewater makes three arguments: that there was no meeting of the minds giving rise to contractual liability; that certain conditions precedent were never fulfilled and consequently the contract never became binding; and that AGL suffered no damages from the

aborted charter agreement. We reject each of these claims.

Tidewater is a subsidiary of Steelmet, Inc. In the fall of 1974, another Steelmet subsidiary, Steelmet Export Corp., contracted to sell 9,375 long tons of shredded scrap metal to Empresa Siderugica Del Peru (Sider), a Peruvian corporation. Under the terms of this contract, Steelmet Export undertook to secure and load the scrap at Jacksonville, Florida, for shipment to Peru; Sider agreed to pay for the unloading of the cargo in Peru. In order to fulfill its affiliate's obligations, Tidewater, acting through its broker (Antra), entered into negotiations with AGL's broker (Burbank) concerning a charter for the Mary. These negotiations culminated in a cable, set forth in the margin,[1] sent from Ivar Traa of Antra to Arild Pettersen of Burbank at 7:25 p. m. on November 20, 1974. In the telex, the Mary is identified as the subject of the charter, dates are specified for arrival at Jacksonville and travel to Peru, and the cargo is designated. Further, the cable plainly states that the charter agreement is subject to the receiver's (Sider's) approval of the vessel by 4:00 p. m., November 21, 1974 and is governed by the terms set forth in a form contract used in the industry and known as "Genjapscrap,"[2] subject to details.

The day following receipt of the telex (November 21), Pettersen received from Traa a copy of a Genjapscrap contract used by Tidewater on a previous charter with details included. Pettersen subsequently notified Traa that AGL had no objection to the form, although certain details were lacking.

When the receiver's approval was not immediately forthcoming, AGL extended the deadline by twenty-four hours to November 22 at 4:00 p. m. On November 21 and 22, two Sider representatives (Cesar Molina and Javier Zegarra Zavaleta) met with Robert Waisfisz, a vice president of Steelmet, and Andreas Avraamides, charter manager for Tidewater and export manager for Steelmet Export. During these meetings, Avraamides described the Mary to the Sider representatives, and also offered for their use an alternative ship, the Promethee. Because it had the ship on its own time charter, Tidewater could save substantial costs by using the Promethee for the Sider delivery, provided it could avoid obligation under the contract with AGL. Although it appears that the Promethee possessed certain other advantages over the older Mary, the Sider people were primarily concerned with the comparative arrival time of the two ships. Accordingly, they expressed a preference for the Promethee, upon Avraamides' representations that it was likely to arrive in Jacksonville before the Mary and that the Mary required a special insurance premium because of its age.

On November 22, the preference of the Sider representative was communicated to Traa and, sometime thereafter, to Pettersen and his principal, AGL. In the meantime, however, on November 24, AGL had cabled its agents in Peru inquiring into the status of Sider's approval. On the 26th, AGL's agents replied that Sider had refused to intervene in any way in the fixture of the vessel—either to approve or disapprove its use for the contract. Also on November 26,

1. WE CONFIRM HAVING FIXED TODAY AS FOLLOWS ACC TIDEWATER TERMINALS INC MV MARY GREEK FLAG BLT 57 14783 DWAT GLESS ORECARRIER, BRIDGE BETWEEN HATCHES 2 AND 3, ENG AFT 5 HOLDS/HATCHES BUT CARGO ONLY TO BE LOADED IN HATCHES 2–5 9375 LT MINMAX SHREDDED SCRAP STOWING MAX 40/LT 1 SB JACKSONVILLE/1 SB CHIMBOTE NOV 27/DEC 9 (PRESENT ETA NOV 28) 2500 LT LOAD/800 LT DISCH ALL PER WWDSHEX EIU

US 29, 25 PER LT FIOT, 95 PCT PPD 4500 DEM/ HD LTS NEGOTIATIONS AND EVENTUAL FIXTURE TO BE KEPT STRICTLY CONFIDENTIAL SUB RECEIVERS APPR OF VESSEL LATEST 1600 HOURS NOV 21 OWISE GENJAPSCRAP SUB DETS 3,75 TTL HERE (A. 148a, 150a).

2. "Genjapscrap," is a standard form contract often used when chartering a vessel for shipping scrap metal. Its name apparently comes from its use in the shipment of scrap to and from Japan.

Avraamides cabled Sider asking for a written confirmation of its acceptance of the Promethee. Sider responded by cable on the 28th that under its contract with Steelmet Export it had no authority whatsoever to "decide on the vessel which will carry the material."

The Promethee subsequently carried the scrap to Peru at the instruction of Tidewater, and AGL attempted to mitigate its injury by securing another charter for the Mary. These attempts were not wholly successful, however, and the court below found that AGL sustained $62,746.55 in damages from the breach of the contract.

Judge Metzner held Tidewater liable for breach of the charter party. He found that all the essential terms of the charter were set forth or referred to in the November 20 telex,[3] and that Sider would have given its approval as required by the telex, had Tidewater asked it to do so. As he further found that Tidewater for its own reasons had deliberately failed to get Sider's approval, he concluded that Tidewater was liable for the breach. The trial court's findings of fact support these conclusions and the record shows that they are not clearly erroneous.

The record shows that Sider left to Tidewater the decision as to which vessel to charter. Sider did not know that Tidewater itself was the time charterer of the Promethee and had already chartered the Promethee, on November 22, to Steelmet Export to carry the cargo of scrap.

As Judge Metzner found, the reasons advanced by Tidewater for choosing the Promethee over the Mary were contrary to fact. The insurance penalty because of the Mary's age could not have mattered as that was for the account of the vessel owner, as shown by the charter form. As for the assertion that the Promethee could be loaded earlier in Jacksonville, Avraamides could not have known at the time which vessel would arrive first in Jacksonville. Moreover, Antra's notification to Burbank that Sider refused to accept the Mary because of its age was untrue. In sum, there is ample support in the record for the conclusion that Tidewater wanted the business for itself, unbeknown to Sider, and deliberately chose not to ask Sider's approval of the Mary, but instead arranged for Sider to use the Promethee.

■ We agree, therefore, with Judge Metzner's conclusion that the condition precedent of Sider's approval was excused by Tidewater's bad faith failure to make any effort whatever to secure Sider's approval, an approval which would have been immediately forthcoming, in light of all the circumstances. See 2 A. Corbin, Contracts § 310, at 112 (1950); 5 W. Jaeger, Williston on Contracts § 677, at 225 (1961).

■ Lastly, the appellant takes issue with the district court's calculation of damages. According to Tidewater, AGL, far from losing $62,746.55 by its failure to carry the scrap to Peru, actually saved itself from a $70,907.20 loss. Judge Metzner's opinion states that he reviewed the computations in AGL's post trial brief and that the evidence supported the plaintiff's claim for damages of $62,746.55. Moreover, Judge Metzner specifically found that the contract ended with the unloading in Peru and he therefore rejected the defendants' claim that costs of the ship returning empty from Peru were properly deductible from any hypothetical profit the plaintiff would have received. The calculations referred to indicated that the net revenue AGL would have received under the contract was $263,935.55. Expenses shown in the plaintiff's post trial brief include: $147,000 which AGL paid for its time charter of the Mary for the time in question; $35,600 for fuel that would have been consumed on the voyage; $13,000 estimated port charges; and $5,589 for the extra insurance AGL would have had to pay under the terms of the charter. Thus, AGL argued, and Judge Metzner found, that $62,746.55 represents a reasonable esti-

---

**3.** Tidewater also contends that as the telex read "sub dets" it did not set forth all the essential details because additional details remained to be agreed upon. The record does not indicate, however, that there were any details of substance not covered by the telex.

mate of the profit AGL would have made but for Tidewater's breach. The record supports these findings of damage; we cannot say they are clearly erroneous.

Affirmed.