In the Matter of the arbitration between
**POLLUX MARINE AGENCIES, INC.,**
**as Agents for the Owners of the M.V.**
**CAPTAIN DEMOSTHENES, Petitioner,**

**and**

**LOUIS DREYFUS CORP., Respondent.**

No. 78 Civ. 537.

United States District Court,
S. D. New York.

July 13, 1978.

Healy & Baillie, New York City, for petitioner; Nicholas J. Healy, Jr., New York City, of counsel.

Hill, Rivkins, Carey, Loesberg & O'Brien, New York City, for respondent; Francis J. O'Brien, New York City, of counsel.

ROBERT J. WARD, District Judge.

Petitioner, Pollux Marine Agencies, Inc., agent for the owners of the vessel M.V. "CAPTAIN DEMOSTHENES", moves pursuant to 9 U.S.C. §§ 4 & 5 for an order appointing an arbitrator and directing respondent Louis Dreyfus Corp. to proceed to arbitration in accordance with an arbitration clause contained in a time charter party allegedly entered into on July 30, 1976 by petitioner, as agent for the owners of the M.V. "CAPTAIN DEMOSTHENES," and respondent as charterer. For the reasons hereinafter stated, the portion of the motion which seeks to compel arbitration under § 4 is granted, but the portion which seeks to compel the appointment of an arbitrator under § 5 is denied as moot.

The issue in this suit is whether there was a binding fixture of the M.V. "CAPTAIN DEMOSTHENES" on July 30, 1976. If there was, then presumably the only question remaining would be what damages, if any, petitioner incurred as a result of respondent's alleged breach.

Petitioner asserts that on July 30, 1976 a time charter party arose by virtue of the parties' reaching a binding agreement on the "main terms" of the charter party, subject to the inclusion of certain "pro forma details" to be negotiated later. In support of this assertion it cites a "fixture recap" telex sent to respondent's broker on July 30,

1976, which reads in part: "We confirm having fixed the foll with you today subject details of Eldece Time." [1] It is undisputed that "Eldece Time" refers to respondent Louis Dreyfus Corp.'s (*i. e.,* "LDC") pro forma time charter. [2]

It is petitioner's contention that so long as there was a meeting of the minds on the main terms, and allegedly there was, there was a contract; the negotiation of pro forma details was merely a condition subsequent and therefore even if the parties could not agree on all of the details there would nonetheless be a contract. In any event, petitioner claims that the parties did agree on all of the pro forma details as well.

One of the pro forma details of the Eldece Time was clause 17 of the New York Produce Exchange form which provides in pertinent part: "should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen . . .." Petitioner invokes this clause, contending that it became effective on July 30, 1976 as part and parcel of an integrated contract of charter party which arose on that date.

Respondent has maintained and continues to maintain that there was no fixture and therefore it did not repudiate it. Essentially, respondent's position has been that because the telex of July 30, 1976 indicated that the fixture was subject to details of Eldece Time, no binding agreement could arise until all of the details were agreed upon, and so long as any term was left open each party was free to renegotiate any term previously agreed to or back out entirely; pursuant to respondent's request, it allegedly was agreed that all details must be agreed upon by August 2, 1976; there

allegedly was not an agreement on each and every detail by August 2, 1976; therefore, no binding fixture ever occurred and respondent was entitled to back out of the agreement.

Consistent with this position that no charter party came into existence, until quite recently respondent staunchly contended that the arbitration clause within the charter party likewise never came into existence. [3] Consequently, from December 12, 1977, the date on which petitioner first demanded arbitration, until June 8, 1978, respondent refused to arbitrate and actively opposed the instant petition, through extensive discovery, briefings, affidavits and several court appearances. The upshot of all this was that the parties' submissions raised disputed issues of fact. Accordingly, at a pre-trial conference held on June 2, 1978, the Court set the matter down for trial on Monday June 12, 1978, as both sides at that time agreed was necessary under the controlling authority in this circuit. *E. g., A/S Custodia v. Lessin International, Inc.,* 503 F.2d 318 (2d Cir. 1974); *Interocean Shipping Co. v. National Shipping & Trading Corp.,* 462 F.2d 673 (2d Cir. 1972).

On June 8, 1978, however, respondent suddenly shifted gears and decided to admit the existence of the arbitration agreement while continuing to deny the existence of the charter party which contained the arbitration agreement. On that date, counsel for respondent wrote a letter, which was hand-delivered to the Court and petitioner's attorneys on Friday, June 9, 1978, in which it nominated an arbitrator in response to petitioner's December 12, 1977 demand for arbitration. [4] On June 9th, at a pre-trial conference convened in response to this letter, respondent articulated the position that the arbitration clause somehow constituted

1. Petitioner's Exhibit 1 in evidence.

2. Respondent's Exhibit A in evidence.

3. *E. g.,* the Answer filed February 23, 1978 contains, *inter alia,* a denial of petitioner's allegations that a charter party arose on or about July 30, 1976 and that the charter party contained the arbitration clause quoted in ¶ 4 of

the petition to compel. In addition, it lists as a second affirmative defense that there never was "a contract and/or other agreement" between the parties, and as a third affirmative defense that there was no agreement to arbitrate between petitioner and respondent.

4. Respondent's Exhibit F in evidence.

a separate agreement,[5] pursuant to which it was now appointing an arbitrator and was willing to arbitrate so long as the arbitrators would decide the question of the existence *vel non* of the alleged charter party.

Petitioner opposed submitting this question to the arbitrators, asserting that the existence or non-existence of a charter party was a threshold question of law for the Court. · On June 9th the Court indicated its tentative agreement with petitioner's view that the contract question was one for the Court. In addition, the Court noted that the new position being espoused by respondent was inconsistent with the Answer it had filed, and was inconsistent with its argument that there could be no contract on any of the terms so long as there was non-agreement on any other term. As to the former inconsistency, counsel suggested that it could be alleviated by amending its Answer, although the Court notes it did not seek leave to do so. As to the latter inconsistency, counsel made no response. Leave was requested to brief the question of whether the existence or non-existence of the charter party was arbitrable, or, as respondent would phrase it, whether respondent's consent to appoint an arbitrator and arbitrate robs this Court of jurisdiction to act further under 9 U.S.C. § 4. The Court acceded to this request, scheduled briefs for the following week, and tentatively scheduled a trial for Monday June 19, 1978 in the event that the Court remained unpersuaded by respondent's argument.

Prior to and on June 19, 1978, the parties did submit briefs on the question of the arbitrability of the existence of the alleged contract. In addition, on June 13, 1978, without obtaining the necessary leave of Court or written consent of petitioner,[6] respondent filed an amended answer reflecting its new position.

### 1. The Amended Answer

On June 19, 1978, in open Court, petitioner confirmed that it was opposed to the filing of the amended Answer, whereupon respondent moved orally for leave of court nunc pro tunc. Leave was denied and the filed amended Answer was stricken.

The Court is well aware that leave to replead "shall be freely given when justice so requires." Rule 15(a), Fed.R.Civ.P. Although this standard is liberal, the proviso "when justice so requires" necessarily implies justice to both parties. Thus, the Court must "examine the effect and timing of the proposed amendments [to the Answer] to determine whether they would prejudice the rights of . . . the other part[y] to the suit." 6 C. Wright and A. Miller, *Federal Practice & Procedure,* § 1484, at 420 (1971).

Petitioner would be prejudiced by respondent's late change of heart. Four months have elapsed since issue was joined in this case and six months have elapsed since petitioner demanded arbitration. Thus, there has been significant delay in resolving whether petitioner has a right to arbitrate its alleged damages.[7] However,

---

**5.** As will be elaborated upon further *infra,* respondent appears to argue that there are two bases for the alleged separate arbitration agreement. One is that the· arbitration clause is severable (from the non-existent charter party). The other is that there was an ·independent contract to arbitrate.

**6.** Rule 15(a), Fed.R.Civ.P., provides in pertinent part:

[I]f the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, he may so amend it at any time within 20 days after it is served. Otherwise a party may amend his pleading only by leave of court or by written consent of the adverse party.

Inasmuch as this case had been called for trial, and almost four months had elapsed since the original Answer had been served, leave of court or written consent of petitioner was required.

**7.** The Court does not suggest that respondent litigated its initial position in a dilatory fashion. However, it would be dilatory if the Court were to permit respondent to avoid the trial for which both sides and the Court prepared and instead arbitrate the charter party question, and possibly seek to overturn the arbitration award, if unfavorable, by a subsequent motion to vacate and, if unsuccessful, by an appeal. This scenario is particularly unattractive to the Court inasmuch as it is convinced that the contract question is one for the Court, as will be discussed *infra,* and that respondent as-

this delay in itself is not dispositive of whether or not petitioner would be prejudiced by the respondent's shift in position, inasmuch as petitioner has indicated that, if it is determined that there was a charter party and that the damages, if any, will be arbitrated, it would be willing to postpone the arbitration on damages for approximately six months so that the parties can observe whatever price fluctuations may occur in the charter market during the balance of the alleged time charter. Besides the delay, however, respondent's initial position and its current position have caused petitioner to incur substantial costs. In connection with the motion to compel, which respondent hoped to moot by the proposed amended Answer, three depositions were taken, numerous briefs and affidavits were submitted, and several court appearances were required. In addition, another Court appearance and a round of briefings resulted from respondent's sudden reluctance to have the Court decide whether or not a charter party exists. These costs, the delay and the resultant uncertainty as to whether or not there was a charter party on which petitioner can base a right to arbitrate damages, have prejudiced petitioner. For this reason, unconditional leave under Rule 15(a) for respondent to amend its Answer would be unfair to petitioner. Accordingly, unconditional leave was properly denied.

Because the Court has found unconditional leave to amend inappropriate inasmuch as it would be unfair and prejudicial to petitioner, respondent likewise should be estopped to change its position after inducing petitioner to file suit, move to compel, conduct discovery and otherwise actively litigate the question of whether there was a charter party that included a provision for arbitration. *See Avila Group v. Norma J. of California,* 426 F.Supp. 537, 541–42 (S.D. N.Y.1977) (Weinfeld, J.).

sumed its new posture out of a newly-founded fear that the Court would decide against it on this question. It is the Court's belief that respondent thought its chances with the arbitrators would be better, or at least no worse, than

The Court is not unmindful that much of the prejudice to petitioner could be alleviated by taxing respondent for all of the costs, including petitioner's attorney's fees, incurred to date in this action. Therefore, the Court briefly considered the possibility of granting leave to amend on the condition that these costs be paid promptly by respondent. *See* Wright & Miller, *supra* § 1486. However, the Court discarded this alternative without discussing it with the parties or determining whether respondent would be willing to accept such leave, because the Court had already reviewed the briefs and researched the law on who should decide whether there was a charter party, and had come to the conclusion that it is a question for the Court. Thus, it concluded that even if it were to permit respondent to amend its Answer on the condition that it bear all of petitioner's costs, and then if it were to find that the resultant diminution in prejudice to petitioner would be so significant that respondent should not be estopped from changing its position, the respondent would have gained nothing because the Court would hold as a matter of law that the charter party question was one for the Court and would not be affected by respondent's concession that there was an agreement to arbitrate.

2. *The Court has Jurisdiction to Decide Whether There was a Charter Party, Regardless of Whether Respondent Concedes that There was an Agreement to Arbitrate, and in the Absence of Consent from Petitioner the Arbitrators Do Not Have Jurisdiction Over the Question*

■ Section 4 of Title 9 of the United States Code provides in pertinent part:

A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order di-

with the Court. Thus, the worst that could happen from arbitrating the contract question would be that respondent would lose later instead of sooner.

recting that such arbitration proceed in the manner provided for in such agreement. . . . If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof.

Although, as respondent correctly asserts, the Court's power to hear under 9 U.S.C. § 4 essentially is limited to the issue of whether or not the parties agreed to arbitrate, in *A/S Custodia, supra*, and *Interocean Shipping Co., supra*, the Court of Appeals reversed the district courts for failing to conduct a hearing on the disputed issue of whether or not a charter party existed. Respondent asserts that in those cases the courts had to resolve a dispute as to the existence of a charter party only because that dispute was incidental to the primary dispute as to the existence of an arbitration clause. It attempts to distinguish those cases by arguing that in the instant case the contract question is not incidental to a dispute for judicial resolution inasmuch as there is purportedly no longer a dispute as to the existence of an arbitration clause: now that respondent has appointed an arbitrator there allegedly is no longer a "failure, neglect, or refusal . . . to arbitrate" and now that respondent asserts that there is an arbitration agreement, which is either severable from or arose independently of any charter party, there allegedly is no longer any issue as to "the making of the arbitration agreement or the failure, neglect, or refusal to perform the same." Assuming arguendo that the distinction drawn between this case and *Custodia* and *Interocean* is correct, the Court nevertheless finds that there is still a dispute as to "the making of the arbitration agreement or the failure, neglect, or refusal to perform the same." Therefore, *A/S Custodia* and *Interocean* are controlling.

There are two reasons why respondent is incorrect in asserting that there is no issue "as to the making of the arbitration agreement." First, it contends, but did not prove, that an arbitration agreement was reached on July 27, 1976,[8] whereas petitioner contends that the arbitration provision came into being on July 30, 1976 as part of an integrated contract of charter party. Thus, there is a disputed issue as to the time of "the making of the arbitration agreement." Second, respondent contends that a dispute as to the existence of the charter party comes within the scope of the disputes covered by the arbitration clause; petitioner contends that it does not. Thus, there is an issue as to which disputes the parties intended the arbitration clause to cover, which would be an issue "as to the making of the arbitration agreement." *See International Union of Operating Engineers Local 139 v. Carl A. Morse, Inc.*, 387 F.Supp. 153, 157 (E.D.Wis.1974), *aff'd*, 529 F.2d 574, 579 (7th Cir. 1976). Given the existence of these issues as to the making of the arbitration agreement, there is a live controversy for this Court to adjudicate pursuant to 9 U.S.C. § 4, despite respondent's eleventh hour concession that there was an agreement to arbitrate.

■ That these issues are for the Court, rather than the arbitrators, to determine flows from the fact that the duty to arbitrate is contractual and a Court cannot compel a party to arbitrate a dispute it did not contractually agree to arbitrate. *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *Humble Oil & Refining Co. v. Local 866, International Brotherhood of Teamsters*, 321 F.Supp. 374, 379 (S.D.N.Y.1970), *aff'd*, 447 F.2d 229 (2d Cir. 1971). Inasmuch as petitioner has opposed arbitrating the contract question on the grounds that it is beyond the scope of the arbitration clause it agreed to, it is incumbent upon this Court to determine the scope of the arbitration clause, lest it improperly compel petitioner to arbitrate a question it did not agree to arbitrate.

■ Thus, the scope of the arbitration clause is the issue before the Court. Although respondent has, quite ingeniously, managed to characterize the issue as one of

---

**8.** See note 15, *infra*.

jurisdiction, in fact it is simply a question of the arbitrability of a dispute respondent wishes to submit to arbitration. Absent an agreement to the contrary, arbitrability is clearly a question for the Court, *International Union of Operating Engineers Local 139, supra,* 529 F.2d at 580; *Humble Oil & Refining Co., supra,* 321 F.Supp. at 379, to be determined by reference to the intent of the parties as reflected in the scope of the arbitration clause. *See Drake Bakeries, Inc. v. Local 50, American Bakery & Confectionary Workers,* 370 U.S. 254, 256, 82 S.Ct. 1346, 8 L.Ed.2d 474 (1962).

■ Here the language of the arbitration clause clearly demonstrates that the parties did not intend the arbitration clause to cover disputes as to the very existence of the contract containing the arbitration clause. Although the arbitration clause is broad, as is argued by respondent, it is limited to disputes "between Owners and *the Charterers.*" If it had covered all disputes between Owners and "Louis Dreyfus Corp.", then it could be argued that it was broad enough to cover a dispute as to the existence of the charter party. However, the use of the word "Charterers" presupposes the existence of a charter and necessarily implies that the existence of the charter was not one of the potential disputes subject to arbitration. Accordingly, the Court finds that the parties did not intend the arbitration clause to cover a dispute as to the existence of the charter party.[9] Therefore, the Court cannot compel the parties to arbitrate this issue.

Respondent attempts to confuse matters by its misplaced reliance on *Prima Paint v. Flood & Conklin Manufacturing Co.,* 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), and *Robert Lawrence Co. v. Devon-*

shire *Fabrics, Inc.,* 271 F.2d 402, 409 (2d Cir. 1959), *cert. dismissed pursuant to stip.,* 364 U.S. 801, 81 S.Ct. 27, 5 L.Ed.2d 37 (1961). The crux of *Prima Paint* and *Devonshire* was whether the respective arbitration clauses involved were broad enough to cover a defense of fraud in the inducement—a question of what the parties intended the arbitration clause to cover. That it was found that those parties intended that issue, which is extremely different from the issue involved in this case, to come within the scope of an arbitration clause different from the one involved in this case is of no help to respondent. This Court must analyze the parties' intent vis-a-vis the issue and arbitration clause involved in this case.[10]

■ The issue in *Prima Paint* and *Devonshire,* fraud in the inducement, differs from the issue in dispute here in that fraud in the inducement affects only the validity, legality or enforceability of a contract; it does not negate the existence of a contract and thereby raise a question as to the existence, validity, legality or enforceability of the arbitration clause therein. *Prima Paint* specifically stated that "if the claim is fraud in the inducement of the arbitration clause itself—an issue which goes to the 'making' of the agreement to arbitrate—the federal court may proceed to adjudicate it." 388 U.S. at 403–04, 87 S.Ct. at 1806; *accord, Devonshire, supra* at 411. By a parity of reasoning, here the dispute as to the making of the charter party, as opposed to a fraud defense to its legality, validity or enforceability, raises an issue for trial as to the making of the arbitration clause contained therein. *Interocean Shipping, supra.*

Respondent's answer is that either the arbitration clause is severable or else there

---

**9.** There is authority that an agreement to arbitrate this question would be invalid anyway as going beyond the scope of matters referable to arbitration under 9 U.S.C. § 2. *Kukulundis Shipping Co. v. Amtorg Trading Corp.,* 126 F.2d 978, 986 (2d Cir. 1942).

**10.** The arbitration clause in *Prima Paint* covered "[a]ny controversy or claim arising out of or relating to this Agreement, or the breach thereof." 388 U.S. at 398, 87 S.Ct. at 1803. The

arbitration clause in *Devonshire* covered "[[a]ny] complaint, controversy, or question which may arise with respect to this contract." 271 F.2d at 412. By comparison, the arbitration clause involved in the instant petition broadly covers "disputes", but is expressly limited to disputes "between Owners and Charterers," and therefore impliedly excludes disputes as to the existence of the charter.

was an independent arbitration agreement. It argues that in either case, the making of the charter party would be a separate issue from the making of the arbitration clause and therefore a dispute as to the former would not necessitate a dispute as to the latter.

▮▮▮ Turning first to severability, it does seem to the Court [11] that something can be severed only from something else that exists. How can the Court "sever" an arbitration clause from a non-existent charter party? Despite its inability to conceptualize respondent's argument, the Court will address it.

▮▮ On the severability question, respondent cites as dispositive abstract language from *Prima Paint* and *Devonshire*.[12] However, it does not cite the applicable language from *Devonshire,* namely: "Certainly this is not a case like *Kulukundis* [126 F.2d 978 (2d Cir. 1942)] . . . where the defendant denied ever agreeing to [a charter party]. *Naturally such a question had first to be settled before arbitration could be directed.*" 271 F.2d at 411 (emphasis added). Respondent also does not cite the similar language of *In re Kinoshita & Co.,* 287 F.2d 951, 953 (2d Cir. 1961), that "[t]here would be . . . an obstacle [to severing] if it was claimed . . . that [a] signature to the contract was a forgery, or that for any other valid reason there had at no time existed as between the parties any contractual relation whatever. In such an event a trial of this issue would be required before an order could be issued directing the parties to proceed to arbitration." [13] *Kinoshita* and *Devonshire* indicate that, contrary to respondent's contention, the controlling principle of law is that an arbitration clause is not severable when the existence of the contract from which it is to be severed is in dispute.[14]

▮▮▮ Moreover, the quest for the applicable principle should not obscure the fact that severability should depend upon the intent of the parties at the time they purportedly contracted. *In re Weinrott,* 32 N.Y.2d 190, 197–98, 344 N.Y.S.2d 848, 855, 298 N.E.2d 42 (1973); *see Prima Paint, supra* 388 U.S. at 402, 87 S.Ct. 1801. Accordingly, the Court has examined the parties' intent with respect to severability and holds that the language of the arbitration clause evidences an intention that it not be severable in the context of a dispute as to the existence of the contract containing the arbitration clause for, as the Court found *supra,* the use of the word "Charterers" in the arbitration clause presupposes the existence of a charter and necessarily implies that the existence of the charter is not a question for arbitration. In other words, because the arbitration clause is not broad enough to cover the dispute which respondent seeks to arbitrate, the parties could not have intended the arbitration clause to be severable for purposes of compelling arbitration of that dispute.

Obviously, if the parties did not intend the arbitration clause to be severable insofar as they did not intend to arbitrate a dispute as to the existence of the charter party, respondent cannot now override that intent by simply conceding the existence of the arbitration clause.

For the foregoing reasons, the Court holds that the arbitration clause is not severable.

11. Severability is clearly an issue for the Court. In determining this the Court is to apply federal law, consisting of generally accepted principles of contract law, *see Avila Group, Inc. v. Norma J. of California,* 426 F.Supp. 537, 540 (S.D.N.Y. 1977), for a charter party is merely a contract and hence is subject to all rules and requirements of contract law. *Interocean Shipping, supra,* 462 F.2d at 676 n. 6.

12. *Prima Paint* stated that the Second Circuit rule on severability of arbitration clauses was that except where the parties intend otherwise arbitration clauses are severable. *See* 388 U.S. at 402, 87 S.Ct. 1801. *Devonshire* stated that the "Arbitration Act envisages a distinction between [sic] the entire contract . . . and the arbitration clause of the contract . . .." 271 F.2d at 409.

13. Quoted with approval in *Interocean Shipping, supra,* 462 F.2d at 676.

14. This principle would appear to be an implicit recognition that something can be severed only from something else that exists.

**220**

The Court similarly rejects the contention, urged of late, that there was an independent, as distinct from a severable, contract of arbitration. Aside from the fact that this contention is inconsistent with respondent's position that a party would not be bound on any term so long as there was no agreement on every detail—a legal position which the Court rejects, *infra*—there is also no proof of any independent meeting of the minds with respect to the arbitration clause. In response to an inquiry by petitioner's counsel in open court on June 19, 1978, respondent's counsel indicated for the first time that respondent was maintaining that such a meeting of the minds, presumably on that single term, occurred on July 27th. However, no offer of proof was made and no proof was introduced to support this contention.[15]

▄▄▄ The Court finds that the evidence in the record conclusively proves that the parties did not intend to be bound solely on the arbitration clause,[16] which, after all, was not a main term, but was merely one of the pro forma details on the Eldece Time form.[17] Thus, there was no independent contract to arbitrate.

Inasmuch as there was no independent or severable arbitration agreement, the dispute as to the existence of the charter party raises an issue as to the existence of the arbitration clause contained therein. Accordingly, as the Court indicated *supra,* there is an issue as to the "making of the arbitration agreement" which this Court is required to determine, pursuant to 9 U.S.C. § 4 and in accordance with *A/S Custodia, supra,* and *Interocean Shipping, supra,* in order to decide whether to compel arbitration. The Court now turns to the determination of that issue, namely, whether the

parties entered into a charter party on July 30, 1976.

3. *June 19, 1978 Trial on Whether a Charter Party was Entered into on July 30, 1976: Findings of Fact and Conclusions of Law*

At the trial, respondent stood on its "jurisdictional" objection and did not participate—*except* to make opening and closing statements and introduce exhibits into evidence. Counsel for petitioner called one witness and read from a deposition.

Petitioner's witness was John Craig Dillon ("Dillon"), a broker with the shipbrokering firm of Greenwich Chartering & Consultants, Inc. Dillon testified that he has negotiated approximately 300 time charters and that his firm has acted as brokers for both petitioner Pollux and respondent Dreyfus in the past, representing each about an equal number of times. In contrast, Sagus Marine Corporation, which represented respondent Dreyfus, is, Dillon testified, the "house broker" for Dreyfus.

The details of the alleged fixture were testified to by Dillon as follows:

On or about July 27, 1976, Sagus Marine quoted a time charter to Dillon's office for a vessel of the size of the Captain Demosthenes for a period of two or three years. Dillon then quoted the order to a Mr. O'Reilly at Pollux, agents for the Captain Demosthenes. O'Reilly communicated a firm offer of the vessel to Dillon on July 27. Dillon then relayed the offer to Robert Jr. Spaulding at Sagus who talked to his principals and about a half hour to an hour later made a counter-offer providing in part that the vessel must be "Greek Flag with ITF in order . . . . [S]ub details pro forma."

15. As explained *infra,* respondent purported to stand on a jurisdictional objection and did not call any witnesses at the June 19th trial, although it did present documentary evidence.

16. The Court's reasoning and finding, *supra,* that the parties did not intend the arbitration clause to be severable and did not intend the existence of the charter party to be arbitrable support a finding that they did not intend to be bound solely on the arbitration clause.

17. See clause 17 of respondent's Exhibit A in evidence.

Based on the manner in which the parties negotiated the pro forma details, *see infra,* the Court is of the view that the agreement on this term occurred on August 2 or August 3 when the owners failed to object to it.

Dillon testified that "ITF in order" means that the vessel's crew is employed under a trade union agreement which is acceptable to the International Trade Federation. "Sub details pro forma" meant that what they were negotiating were the "main terms" and that further details were to be based on the Dreyfus pro forma (Eldece Time) charter.[18]

This counter-offer was communicated to O'Reilly at Pollux on July 27. Later that day O'Reilly made a counter-offer repeating the owner's last offer, but agreeing to provide a Greek Flag vessel and suggesting that the use of a Greek Flag vessel obviated the need for ITF.

Sometime later, between 1:00 P.M. and 1:30 P.M. on July 27, Spaulding made a counter-offer calling in part for Greek Flag, Greek Collective Agreement and "otherwise per Dreyfus last." Dillon communicated this to O'Reilly who, about 3:30 or 4:00 P.M., repeated the owner's last offer, except changing the rate, for a reply by 10:00 A.M. on July 28. Dillon communicated this to Spaulding.

"For reply by 10:00 A.M. next day" means, Dillon testified, that the vessel is "out firm" to those prospective charterers until 10:00 A.M. the next day.

On the morning of July 28, Dreyfus advised that it would not take a time charter without a boycott clause. Dillon explained that a boycott clause meant that if the vessel were boycotted because of unacceptability to ITF then the vessel would be off-hire during the boycott. Clause 15A pt (ii)

of Eldece Time contained such a boycott clause and Clause 15A pt (iii) provided for ITF.[19] O'Reilly told Dillon that he would discuss this with the owners, but did not think they would fix the vessel with a boycott clause. There were several discussions that day on the boycott clause. In the meantime, negotiations regarding the charter period, delivery and re-delivery areas, rate, commissions and overtime—the terms on which there was still no agreement—were suspended because neither side would negotiate unless they could agree on a boycott clause.

On July 29 Dreyfus made a bid which included a provision for a Greek Collective Agreement and a boycott clause. Dillon telephoned and telexed the boycott clause to O'Reilly that same day. Later that day, O'Reilly declined the bid, did not make a counter-offer, and would not proceed with the negotiations so long as Dreyfus insisted on a boycott clause. There were no further negotiations on July 29.

During the afternoon of July 30, Sagus, through David Robin Masters, rather than Spaulding,[20] stated that Dreyfus would go ahead without the boycott clause. On that basis, O'Reilly made a fresh offer about 6:00 P.M. on July 30. Dillon telexed this offer to Sagus, which proposed a counter-offer. Negotiations continued for a couple of hours by telephone, with Dillon eventually speaking with both sides simultaneously on two telephones. The culmination of this was a fixture on all the main terms reached at about 8:00 P.M. on that Friday evening, July 30, and memorialized in a fixture recap

18. Respondent's Exhibit A in evidence.

19. That clause provided in pertinent part:
15A. [T]he time lost for which hire shall cease (or be suspended) shall also include—inter alia—

.        .        .        .        .

(ii) losses of time due to delay to the vessel or interference with Charterers' use of the vessel by strikes, boycotts or secondary boycotts, manifestations or stoppages in any form on account of the vessel's flag, registry, ownership, manning or wages pattern or her previous trading.

(iii) The owners of the vessel guarantee that the minimum terms and conditions of employment of the crew of the vessel are now or will be prior to presentation of the vessel for delivery and will remain for the period of this Charter Party covered by an I.T.F. Agreement or a bona fide Trade Union Agreement acceptable to the I.T.F.

20. Dillon testified that he believes Spaulding was away from his office that day. He further testified that he knew Masters and that Masters occupied the same position at Sagus as Spaulding, namely, a broker.

sent from Dillon to Sagus that same evening.[21]

This fixture recap of July 30 provided in part: "We confirm having fixed the foll with you today subject details of Eldece Time", and provided that the

Owners warrant that on delivery vessel will be Greek Flag Vessels [sic] crew will be of Greek Nationality and vessels [sic] crew will be members of the Greek Collective Agreement and to be so maintained throughout the term of this Charter.

[hereinafter referred to as the "substitute clause"].

On Monday morning, August 2, O'Reilly telephoned his exceptions to the pro forma details. Sagus agreed to some, but not to others. The parties continued to negotiate the details and by August 3 all of them had been agreed upon, except pro forma clause 15A pts (ii) and (iii).

As to clause 15A pts (ii) and (iii), the Eldece Time boycott and ITF clauses, respectively, when O'Reilly telephoned in his objections on the morning of August 2, he stated that this clause should be deleted because the parties had already reached agreement on these matters on July 30. Dreyfus, however, stated around noontime on August 2 that it wanted to retain Clause 15A pts (ii) and (iii). Later that day, O'Reilly reiterated that these matters had already been agreed to and therefore the clause should be deleted. Subsequently, on August 2, Dreyfus again commented on details and said it would "revert" in the morning regarding Clause 15A pts (ii) and (iii).[22] Nothing further was said about the boycott clause on August 2.

On the morning of August 3 Dreyfus commented on details and as to the boycott clause stated that it would be willing to make minor alterations to it but would pre-fer that the owner make a proposal. In response, O'Reilly reluctantly proposed a modification to Clause 15A pts (ii) and (iii). Dreyfus then added a clause to O'Reilly's proposal and O'Reilly added a clause to Dreyfus'. Dreyfus then stated that it wanted 15A pt (ii) as printed on LDC.[23] O'Reilly would not agree and so the negotiations on this point ceased on August 3.

On August 5, O'Reilly made a proposal with respect to a boycott clause without prejudice to his position that there had already been a fixture which covered this matter. Dillon communicated this proposal to Dreyfus on August 5.

Dreyfus responded on August 6 that the proposal would have been acceptable with minor alterations while negotiations were still going on, but it was too late now inasmuch as Dreyfus was already trading other tonnage. All negotiations then ceased.

Dillon further testified that he had no recollection of Dreyfus' imposing a deadline of 1500 hours on August 2 as the time by which all pro forma details must have been agreed upon.

Petitioner then read from the deposition testimony of Mr. Spaulding of Sagus Marine Corporation. Spaulding testified that on the list of objections O'Reilly made to various pro forma details, he (Spaulding) made hand-written comments reflecting the approval or disapproval of Mr. Waterkind of Dreyfus. Next to petitioner's request that Clause 15A pts (ii) and (iii) be deleted, Spaulding wrote "no." He explained that notation as follows:

Q  What did you understand that to mean?

A  I understood that to mean that we now wanted Clause 15A  .  .  . .

.  .  .  .  .

---

21. Petitioner's Exhibit 1 in evidence. Respondent does not challenge the accuracy of this fixture recap telex or the fact that there was a consensus on those terms at that point. See Spaulding deposition at 40. It contends solely that those terms could be renegotiated so long as there was no agreement on all the details.

22. "Revert in the morning" meant that Dreyfus would consider what O'Reilly had said and would get back in the morning.

23. Dreyfus agreed to delete pt (iii) of Clause 15A, the ITF provision.

[Waterkind] would not delete Paragraph 2 but he would delete Paragraph 3 [of Clause 15A].

Q Paragraph 2 is part of the original boycott clause which has been put forward?

A At this point in time is where there is an obvious change of decision on the part of Dreyfus as charterers as far as the boycott clause goes.

Q They decided at this point that they wanted that reinstated at least in part?

A Correct.

Q Correct?

A Correct.

Q By the way, do you recall the conversation about that clause on the second?

A Not exactly, no. I probably in all honesty denoted some surprise.

Q Well, I want you to be honest.

A I probably noted some surprise but I don't remember really, probably.

Q Did you say to Mr. Waterkind, anything to the effect of, gee, this had been agreed?

A Probably.

Q And he overruled you, is that correct?

A Correct.

Q Did you tell him that you would have a problem with that?

A I might have expressed some—not displeasure because I do what he tells me to do, but concern and this is when he would say something like "Look Bob, we are not agreed on details, we can change anything we want at any given time."

. . . . .

Q So you told him there had been agreement but he told you that there hasn't been agreement on all the details, therefore he could change the agreement?

A Correct.

. . . . .

Q Mr. Dillon in his examination today referred to what he called main terms, are you familiar with that?

A Pretty much, yes.

Q The way if I understood his testimony, the way he described it, is that there are certain relatively important terms including the rate, number of years, delivery port, port of delivery and so on. Which are customarily negotiated, is that your understanding?

A Yes, sir.

Q You would call those main terms too?

A Yes, sir.

Q He also stated that if there were any particular clauses which in the context of a particular trade was important, that would be a main term that would be negotiated also?

A Yes.

Q Is that your understanding?

A Yes, sir.

Q He described the boycott clause as such a main term?

A In this instance I would have to agree with him, yes.

Q That was a main term?

A Right.

Q It's your understanding I gather that as of July 30th there had been agreement of the main terms sub-details?

A Correct.

(Spaulding Deposition Transcript at 55–57, 59–61)

Contrary to the argument originally advanced by Dreyfus, a binding fixture occurs when there is an agreement on all essential ("main") terms. *A/S Custodia, supra* at 320; *Interocean Shipping, supra* at 676; *e. g., Interocean Shipping Co. v. National Shipping & Trading Corp.*, 523 F.2d 527 (2d Cir. 1975), *cert. denied*, 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976). The "subject details" does not create a condition precedent. *Interocean Shipping Co., supra*, 523 F.2d at 535; *Atlantic & Great Lakes Steamship Corp. v. Steelmet, Inc.*, No. 74 Civ. 5648, slip op. at 4 (S.D.N.Y. Feb. 23, 1977), *aff'd*, 565 F.2d 848, 850 n.3 (2d Cir. 1977). Thus, a party is not entitled

to renege on a main term just because the pro forma details still remain open.

The Court finds Dillon to be a highly credible witness and accepts his version of the fixture as true and accurate. On the basis of his testimony, as corroborated by the Spaulding deposition, the Court finds that the boycott clause was not a pro forma detail which Dreyfus could insist upon inasmuch as it was negotiated from July 27 to July 30 as a main term and there was a meeting of the minds on that term on July 30 when Dreyfus indicated that it could work without the boycott clause and work with the substitute clause. Because all other main terms were also agreed upon by July 30, a binding fixture occurred on that date. Thus, the contingency of negotiating pro forma details did not entitle Dreyfus to renege on its agreement to delete the substance of Clause 15A in return for the inclusion of the substitute clause. The Court further finds that all pro forma details were agreed upon by August 3, that the parties had not agreed to a condition precedent that the details be finalized by August 2, and even if they did, that condition was waived by the continued negotiation of details on August 3. Thus, the Court finds that there exists between these parties a charter party, which includes an arbitration clause. Accordingly, the petition to compel arbitration is granted.

The foregoing constitute the findings of fact and conclusions of law of the Court for the purposes of Rule 52, Fed.R.Civ.P.

Settle order on notice.