Charles E. SIGETY, d/b/a Florence
Nightingale Nursing
Home, Plaintiff,

v.

David AXELROD, M.D., Individually and
in his capacity as New York State Com-
missioner of Health; Joanne M. J. Quan,
Individually and in her capacity as Dep-
uty Director, Division of Health Care
Financing, New York State Department
of Health; Raymond Sweeney, Individu-
ally and in his capacity as Associate
Director, New York State Department
of Health; William L. Gormley, Individ-
ually and in his capacity as Director
Bureau of Residential Health Care Fa-
cility Reimbursement New York State
Department of Health; and Peter Ottley
as President, Local 144, Hotel, Hospital,
Nursing Home and Allied Service Em-
ployees Union, Defendants.

No. 81 Civ. 3713 (RWS).

United States District Court,
S. D. New York.

March 29, 1982.

Squadron, Ellenoff, Plesent & Lehrer,
New York City, for plaintiff; Ira Lee Sor-
kin, Jonathan L. Sulds, New York City, of
counsel.

Vladeck, Waldman, Elias & Engelhard, P.
C., New York City, for defendant Local 144;
Irwin Bluestein, Robert A. Cantore, New
York City, of counsel.

## OPINION

SWEET, District Judge.

Presently before the court is the motion
of plaintiff Charles E. Sigety, d/b/a Flor-

ence Nightingale Nursing Home (referred to variously as "Sigety" and "Florence Nightingale") for a preliminary injunction to enjoin the arbitration commenced by defendants Local 144, Hotel, Hospital, Nursing Home and Allies Services Union, SEIU, AFL–CIO ("Local 144") and an oral cross application to enforce the arbitration clause on the grounds that execution of the arbitration clause relating to the 1981–84 agreement was fraudulently induced. Jurisdiction of the court is established by 28 U.S.C. § 1331 and 29 U.S.C. § 185.

This action was originally commenced against Local 144 and in addition David Axelrod, M.D., Commissioner of Health of the State of New York, and other state officials, seeking a declaratory judgment with respect to the rights to Medicaid reimbursement. This phase of the action has been resolved.

On January 22, March 10, 12, 19 and 22, 1982, testimony was presented in open court by the parties. The deposition of Charles Sigety was received on March 25, 1982 in lieu of such testimony because of prior scheduling problems and to accommodate the court's calendar. On the basis of the evidence thus presented, the following findings of fact and conclusions have been reached. As set forth hereafter, upon these findings and conclusions, Sigety's motion will be denied.

The complicated interrelation between collective bargaining and state reimbursement as well as the nature of the nursing home industry itself have given rise to much litigation, considerable labor unrest, and this pending motion. In this instance, I shall seek to limit these findings and conclusions as narrowly as possible in order to minimize my intrusion into the tangled web of relationships, some resolved and some unresolved.

Prior to 1980 Sigety was a member of an industry-wide bargaining group, the Greater New York Health Care Facilities Association, Inc. ("Greater New York") which had entered into a three-year collective bargaining agreement with Local 144 in 1978, which expired on March 30, 1981. In January, 1980, Sigety withdrew from Greater New York and sometime thereafter joined the Southern New York Health Care Facilities Association, Inc. ("Southern New York") which also was a bargaining instrumentality for its members. The reasons for this change in membership status is not material to the disposition of this dispute.

Negotiations for a new contract between Local 144 and the Associations commenced in 1981. Toward the end of the negotiating period, on March 21, 1981, an action was brought by Florence Nightingale and other nursing homes in the Eastern District of New York, *Clearview Nursing Home, et al. v. Local 144*, 81 Civ. 0854, seeking to stay all arbitration under the 1978 collective bargaining agreement on the grounds that the plaintiffs had withdrawn from Greater New York and were no longer bound. A temporary restraining order staying arbitration was signed by the Honorable Arthur Bramwell on March 30, to expire on April 4, 1981, on which date the motion for a preliminary injunction was to be heard. At least in part involved in this litigation and the negotiations was the effect of the Feerick awards which were certain determinations arrived at by the distinguished arbitrator, John Feerick, Esq.

Negotiations continued at the Sheraton Center Hotel and by the contract expiration date culminated in the customary clock stopping, in the course of which the negotiators were invited to the state offices where the impact of the proposed collective bargaining agreement upon the state cost reimbursement and its methodology were discussed. Both industry and labor were asked by the state to ameliorate their positions and, in ways not material here, certain accommodations were made by both sides. A collective bargaining agreement was reached between Greater New York and Local 144 sometime on April 3, followed by an agreement between the Union and Southern New York. The agreement included the withdrawal of the Brooklyn action.

However, Sigety was not a signatory to this agreement and *on the morning of April*

4, 1981 Local 144 struck Florence Nightingale. By early afternoon Peter Ottley, the President of Local 144, had sufficiently recovered from the rigors of the night before to place a call to Charles Sigety suggesting a meeting to see if the differences between the Union and Florence Nightingale could be resolved. Ottley and the Sigetys had rooms at the Sheraton Center during the negotiations.

Birge Sigety, Charles' son, Francis Washler, the accountant for Florence Nightingale, and Charles Sigety went to Ottley's room in response to his call. Washler had been asked by Sigety to come to the hotel earlier that day to discuss the effect of the agreement that had been signed by Greater New York and its impact on cost reimbursement. The testimony of the Sigety attendants at this meeting was consistent and credible. Ottley's version was not markedly different, except as to one or two critical details, but was, perhaps understandably, somewhat vaguer. A year later, in the calm of the courtroom I find that the conversation included the following.

After small talk and a brief recounting of war stories from the night before, Birge Sigety in response to Ottley's inquiry stated that two matters were of principal concern to Florence Nightingale, the first being the cost reimbursement and its methodology and resolution of these issues in light of the Feerick awards, and the second, weekend staffing. The former issue had been in the forefront of the discussions in the days and nights just passed and the weekend staffing problem had been the subject of discussion over some period of time. The prior contract contained a provision relating to weekend staffing but the industry practice was not uniform.

Ottley stated his conviction that the cost reimbursement issue would be satisfactorily resolved and that he would assist in its resolution. The Brooklyn litigation and its restraint were considered briefly in the context of the cost reimbursement issue, and it was concluded that the action would become moot upon the resolution of the cost reimbursement problems. Three alternatives to solve the weekend staffing issue were discussed, redefinition of the period covered, additional staffing, and increased weekend benefits. Ottley indicated that redefinition was unlikely, the Sigetys indicated that additional staffing was too expensive, and the possibility of some different schedule, perhaps every weekend off, was felt to be most promising. Ottley stated his belief that the problem could be solved and that a discussion with the local business agent would result in an accommodation.

Birge Sigety requested Ottley to put his position in writing, Ottley asked Charles Sigety whether or not Sigety trusted him, and upon receiving an affirmative reply, put the same question to Birge. According to the Sigety attendants, Ottley was in tears or on the verge of tears in the face of Birge's challenge to his integrity by requesting a writing. Birge withdrew his demand, the Sigetys and Ottley agreed to terminate the strike, and a written memorandum constituting the collective bargaining agreement was signed shortly thereafter. The pickets were then withdrawn and the strike was over.

The agreement contained a three-year term and incorporated the agreement previously reached the day before between Greater New York and Local 144. Three modifications to the Greater New York agreement were added, one deleted reference to membership in Greater New York, one related to the designation of an impartial chairman, and the third dealt with the possibility of the establishment of a Southern New York welfare fund.

Birge Sigety unsuccessfully sought to reach an understanding on weekend staffing and later requested that the substance of the April 4 meeting be reduced to writing. This action was initiated against the state defendants and the Union on June 16, 1981. On November 12, 1981 Southern New York, the State of New York and Florence Nightingale reached an agreement relating to cost reimbursement and its methodology in which the parties agreed "that because of new collective bargaining

agreements there is a potential for substantial inequities . . ." In addition, past cost reimbursement claims were resolved, it was agreed, among other things, that the challenges to the determination of the Labor Cost Review Panel and this action would be dismissed as to the state defendants, and a methodology for the resolution of future disputes was worked out. The existence of the collective bargaining agreement which is involved in this action was assumed as indicated by the agreement itself and the authorizations to execute the agreement.

To date Florence Nightingale and Local 144 have not resolved to the latter's satisfaction the weekend staffing issue. Florence Nightingale has not made payments to the certain employee benefit trust funds and Local 144 has commenced arbitration to recover such funds. The amount of the withheld funds is alleged without contradiction to be well in excess of a million dollars. To bar arbitration on these issues Florence Nightingale has sought this preliminary injunction.

■ The duty to arbitrate disputes is a legal question for the court to decide rather than the arbitrator since the arbitrator derives his power from the contract. *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 547, 84 S.Ct. 909, 912–13, 11 L.Ed.2d 898 (1964); *Atkinson v. Sinclair Refining Co.*, 370 U.S. 238, 241, 82 S.Ct. 1318, 1320, 8 L.Ed.2d 462 (1962). When a party challenges the existence of the contract the court must determine whether the agreement was entered into and is binding on the parties. *A/S Custodia v. Lessin International, Inc.*, 503 F.2d 318, 320 (2d Cir. 1974); *Interocean Shipping Co. v. National Shipping & Trading Corp.*, 462 F.2d 673, 676 (2d Cir. 1972); *Pollux Marine Agencies, Inc. v. Louis Dreyfus Corp.*, 455 F.Supp. 211, 217 (S.D.N.Y.1978).

■ Under *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967)[1] and its progeny, a claim of fraud in the inducement of the collective bargaining agreement generally is for the decision of the arbitrator where, the arbitration clause is broad enough to encompass that claim. As the Supreme Court stated in *Prima Paint* :

If the claim is fraud in the inducement of the arbitration clause itself—an issue which goes to the "making" of the agreement to arbitrate—the federal court may proceed to adjudicate it. But the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally.

*Id.* at 403–04, 87 S.Ct. at 1806. *See also International Union of Operating Engineers v. Flair Builders, Inc.*, 406 U.S. 487, 92 S.Ct. 1710, 32 L.Ed.2d 248 (1972); *Erving v. Virginia Squires Basketball Club*, 468 F.2d 1064, 1067 (2d Cir. 1972); *Cristina Blouse Corp. v. International Ladies Garment Workers Union Local 162*, 492 F.Supp. 508, 510 (S.D.N.Y.1980). Unless the parties intend otherwise arbitration clauses "are 'separable' from the contracts in which they are embedded." *Prima Paint*, 388 U.S. at 402, 87 S.Ct. at 1803. *See generally* 11 A.L. R.4th 774 §§ 3, 4 at 780–90 (1982). Thus the first issue to be determined is whether the agreement to arbitrate is broad enough to be severable and cover the claim of fraud in the inducement.

■ The agreement signed by the parties expressly incorporated with some modifications the provisions of the collective bargaining agreement between Local 144 and Greater New York. The agreement provided for arbitration of "all complaints, disputes, controversies or grievances arising between the parties hereto, involving questions of interpretation or application of any clause of this agreement, or any acts, conduct or relations between any of the parties hereto . . . ." This clause is broad enough to encompass such claims of fraud in the inducement and there is no evidence of an intent to withhold such issues from the arbitrators and reserve them for judicial resolution. In *Cristina Blouse Corp. v. International Ladies' Garment Workers' Union, Local 162*, 492 F.Supp. at 510, the court, on virtually identical language, decided that

---

1. *See also* the prior Second Circuit's opinion on that case, 360 F.2d 315 (2d Cir. 1966).

the clause was broad enough to encompass the claim of fraud in the inducement. *See also Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. at 398, 87 S.Ct. at 1803 ("Any controversy or claim arising out of or relating to this Agreement, or the breach thereof"); *Robert Lawrence Co. v. Devonshire Fabrics, Inc.*, 271 F.2d 402, 412 (2d Cir. 1959), *cert. dismissed*, 364 U.S. 801, 81 S.Ct. 27, 5 L.Ed.2d 37 (1961) (any "complaint, controversy or question which may arise with respect to the contract"). *But see Pollux Marine Agencies v. Louis Dreyfus Corp.*, 455 F.Supp. at 218 (Disputes "between Owners and the Charterers" by referring to Charterers was construed to presume the existence of a valid charter party).

Florence Nightingale argues that the fraud of Ottley on the early afternoon of April 4 was of such a nature that the agreement to arbitrate is subject to the general claims of fraud, particularly in light of the existence of a temporary restraint then still in effect at least as to Florence Nightingale. I do not adopt this view for such a conclusion would vitiate the distinction set forth in the *Prima Paint* line of cases limiting the court's review to the question of fraud specifically directed at the arbitration provision. Nor do I find the citation of *International Ladies' Garment Workers' Union v. Ashland Industries, Inc.*, 488 F.2d 641 (5th Cir. 1974) persuasive or controlling on this issue. Although the case dealt with fraud in the inducement of a contract, it made no reference to the doctrine of *Prima Paint* or to the scope of the arbitration clause. Thus the remaining issue is whether the agreement to arbitrate, as opposed to the contract generally, was fraudulently induced.

There was no evidence of a knowing intent on Ottley's part to deceive with respect to arbitration. The modification established an arbitration procedure separate from that of Greater New York,[2] and the Bramwell restraint entered the discussion the afternoon of April 4 only tangentially and in connection with the cost reimbursement problem. Not only was Ottley vague about the terms of Judge Bramwell's order during his testimony, he was indifferent as to its effect, having achieved an agreement with all the nursing homes except Florence Nightingale. In addition since the restraint expired by its terms that day, there was no evidence that it was given significant consideration by the parties or that the Sigetys gave serious consideration at any time to its prosecution. Given the history of the parties, the industry and their employment of arbitration procedures throughout the past, it was obviously assumed that arbitration would be required for any agreement to be viable. It was not an identified issue in the discussion between the parties on April 4.

Finally, even taking the Sigetys' views of Ottley's statements, I conclude that they did not constitute fraudulent conduct to induce inclusion of the arbitration clause in the collective bargaining agreement. Not every dispute between the parties, known or unknown, is disposed of by codification at the level of the collective bargaining agreement. Indeed, it is for just this reason that arbitration is made available to both sides to carry out the intent of the agreement. Even further, not every issue must be resolved by arbitration. There is no evidence that Ottley's suggestion of a resolution at the business agent level was not made in good faith. The Sigetys could have insisted on including a written resolution in the agreement and chose for their own purposes not to do so. They were not fraudulently induced to arbitrate by this representation.

As to cost reimbursement, the absence of fraud relative to arbitration is even more evident, since Ottley had no authority to make any commitment in this regard, nor was one seriously sought. There is no evidence of fraud to induce arbitration by this representation.

In reaching the findings and conclusions just stated, I have tried to limit the issue of fraud solely to the effect of representations on the adoption of the arbitration clause.

---

**2.** It is obvious that Florence Nightingale felt the prior arbitration results were improper and its discontent with the so-called Feerick orders was the basis for much of its action.

My findings that any statements made by Ottley did not affect the adoption of that procedure is not to be construed as removing the issue of fraud in the inducement of the contract generally from the arbitrator or to constitute any finding relative to the matters to be presented to him.

The motion of Sigety for a preliminary injunction is therefore denied.

IT IS SO ORDERED.