## SHEET METAL WORKERS INTERNATIONAL ASSOCIATION, LOCAL NO. 33, et al.

v.

## TATE et al.

Court of Common Pleas of Ohio,
Mahoning County.

No. 90–CV–944.

Decided April 8, 1993.

*Green, Haines, Sgambati, Murphy & Macala Co., L.P.A.,* and *Robert S. Moore,* for plaintiffs.

*Albert A. Palombaro,* for defendants.

---

WILLIAM G. HOUSER, Judge.

On April 19, 1990, Sheet Metal Workers International Association, Local No. 33 ("the Union") and Sheet Metal Workers Local No. 33 Collection and Administration Agency, Inc. ("the Agency") filed this action against Robert Tate and Larry Tate, individually and as partners doing business as Roberts Heating and Air Conditioning, to compel an audit of Roberts' payroll records and to collect employee-benefit contributions and Union dues, pursuant to a collective bargaining agreement. Roberts filed a counterclaim against the Union, claiming the Union agent fraudulently represented Roberts' obligations under the agreement. A trial was held on July 28, 29 and August 26, 1992 before the court.

## FINDINGS OF FACT

The Union is a labor organization which represents employees for the purpose of collective bargaining with employers. The Union represents employees in the sheet metal worker trade, consisting of the fabrication, installation, and service of heating and air conditioning systems. The Agency is the collection agent for a

number of multi-employer employee-benefit funds ("the Funds") to which employers are required to contribute by collective bargaining agreements.

At all times relevant to this action, Larry and Robert Tate were brothers and partners in a business known as "Roberts Heating and Air Conditioning" ("Roberts"). The business engaged in the fabrication, installation, and service of heating and air conditioning systems. At all times relevant to this action, Larry Tate was married to Mary Tate and Robert Tate was married to Mechele Tate.

In early 1988, Union Business Representative Robert Kosiorek found Larry Tate on a construction job performing heating and air conditioning work. Kosiorek wanted Roberts to sign a collective bargaining agreement and wanted its employees to join the Union. By the same token, the Tates admitted they were "enthusiastic" about joining the Union. Apparently the Tates felt becoming a Union contractor would be beneficial to their business, enabling them to bid against other Union contractors. Similarly, the Tates wanted to become Union members themselves.

After their initial meeting, Kosiorek and the Tates met over lunch at a restaurant to discuss the process of becoming a Union contractor. The Tates admitted that Kosiorek gave them a copy of the collective bargaining agreement and "went over some basic fine points." Kosiorek said he answered the Tates' questions, explained what their obligations were, and told them to read the agreement and "take their time."

Each of the Tates claimed Kosiorek made additional representations at that luncheon meeting. Larry Tate claimed that Kosiorek said Roberts could be a "split shop," whereby benefit contributions would be made only for work on commercial jobs. On the other hand, Larry Tate also offered a different definition of "split shop," as one where the older, more experienced employees are union members while the newer employees are not members. Robert Tate offered a quite different version of Kosiorek's comments. He testified that Kosiorek said the Tates could be union and do "union work," which he defined as "any place that a contractor and the people that are doing the work are union." Regarding Kosiorek's representations, Robert Tate said:

"I interpreted any time that I go to a job and there is other union contractors on that job, then my brother and myself should do that work."

Robert Tate did not claim that Kosiorek drew any distinction between commercial jobs and residential jobs, nor did he claim that Kosiorek excluded any work from the reach of the collective bargaining agreement. Contrary to his brother, Robert said that *they*, not Kosiorek, mentioned the "split shop" ("That is what my brother and I brought to his attention").

Kosiorek testified that he never discussed a "split shop," that he never said to report only on commercial jobs, and that he never said not to report on employees other than the Tates. The agreement itself states:

"ARTICLE I

"SECTION 1. This agreement covers the rates of pay and conditions of employment of all employes of the employer engaged in but not limited to the (a) manufacture, fabrication, assembling, handling, erection, installation, dismantling, conditioning, adjustment, alteration, repairing and servicing of all ferrous or nonferrous metal work and all other materials used in lieu thereof and of all air-veyor systems and air handling systems regardless of material used including the setting of all equipment and all reinforcements in connection therewith; (b) all lagging over insulation and all duct lining; (c) testing and balancing of all airhandling equipment and duct work; (d) the preparation of all shop and field sketches used in fabrication and erection, including those taken from original architectural and engineering drawings or sketches; and (e) all other work included in the jurisdictional claims of Sheet Metal Workers' International Association."

The Residential Addendum, which Kosiorek recalled discussing with the Tates, says that it covers "all employees of the employer engaged in the fabrication, erection, installation, repairing, replacing and servicing of all residential heating and air conditioning systems." Kosiorek confirmed that the agreement covered *all* employees of a heating and air conditioning contractor except office and clerical workers.

In any event, all witnesses agreed that the Tates took the collective bargaining agreement home and, according to Robert Tate, "We read it all the way through." After reviewing the agreement, the Tate brothers authorized their wives to sign the agreement on their behalf because Kosiorek told them that owners could not be in the Union. All four of the Tates agreed that the agreement was signed with the knowledge of and at the request of Robert and Larry, the acknowledged partners. According to Robert, he and Larry "had the girls sign them."[1] He indicated that the partnership included the two wives and any of the three partners of age could sign on behalf of the partnership.

After signing the agreement at home, the Tate brothers took the agreement to the Union hall and presented it to Kosiorek on or about March 11, 1988. The

---

1. Although Robert's wife Mechele was apparently seventeen years old at the time, there was no question about Mary Tate's capacity to sign the agreement. Indeed, for months after signing the collective bargaining agreement, Mary submitted monthly remittance reports identifying her as "owner."

Tates applied for Union membership and filled out beneficiary forms for the benefit plans. The Tates personally became Union members at that time.[2]

On the very first pages of the agreement, following the table of contents, the agreement prescribed that certain fringe benefit contributions would be paid by the employer. The agreement further stated in capital letters: "NOTE: FRINGES TO BE PAID ON HOURS WORKED." The agreement went on to state:

"All contributions and deductions payable to the funds or plans shall be transmitted by check to the office of 'Sheet Metal Workers Local 5 Collection and Administration Agency, Inc.' with forms showing employees who have worked, the number of hours, and other such data and information as may be required. The complete remittance shall be received in the Funds Office no later than the 20th day of each month following the current month in which the work was performed."

The agreement clearly and unambiguously required employers to contribute on hours worked by their employees.

Regarding their obligation to contribute to the Funds, Robert Tate testified:

"We asked him [Kosiorek], and he said we would be receiving information in the mail, forms that we were supposed to fill out for benefits and such."

As promised, the Agency supplied Roberts with the forms and, for each month from March 1988 through April 1989, Roberts returned a signed monthly remittance form to the Agency.

The remittance forms submitted by Roberts reported no hours worked by anyone other than Robert and Larry Tate and reported the following hours supposedly worked by them:

| MONTH | HOURS REPORTED FOR EACH TATE |
|---|---|
| March 1988 | 16 |
| April | 0 |
| May | 5 |
| June | 3 |
| July | 8 |
| August | 16 |
| September | 0 |
| October | 24 |
| November | 22 |
| December | 0 |
| January 1989 | 0 |
| February | 0 |
| March | 0 |
| April | 0 |

---

2. Both Robert and Larry Tate were suspended from the Union in August 1989 for failing to pay their entire initiation fee.

Kosiorek, who reviews the reports submitted by employers signed to collective bargaining agreements, became suspicious of the low number of hours reported and at Roberts' failure to report other Roberts' employees, whom he had observed working on jobs. Kosiorek confronted the Tates about underreporting. On one occasion on February 2, 1989, Kosiorek accused Larry Tate of not paying the benefit contributions required by the agreement.[3] Kosiorek also told Tate that he violated the agreement by not hiring employees through the Union, showing Tate an advertisement in the newspaper seeking "installers" for Roberts.

Significantly, Tate did not deny being bound by the agreement, did not claim the agreement applied only to commercial work, and did not claim the agreement applied only to his brother and him. Instead, Larry Tate said he was owed thousands of dollars by past customers and did not care if he signed an agreement.

Faced with Roberts' recalcitrance, Kosiorek filed ·a grievance against Roberts over its failure to comply with the agreement. The Tates replied, claiming that their "records will show that we hired no one" and stating they "are willing to pay our monthly dues and fringes." They also claimed they were "allowed to be a split shop." The Joint Adjustment Board, a body composed of equal numbers of labor and management figures and the board with whom Kosiorek had filed the grievance, notified Roberts of a meeting to hear the grievance.

On March 29, 1989, the Joint Adjustment Board held its hearing. According to the minutes, Kosiorek presented evidence of the employer's failure to make proper benefit contributions (and other contract violations), and Roberts offered no rebuttal. The board found that Roberts had violated the agreement and ordered Roberts "to pay all applicable wages and fringes for all employees covered for work under the Sheet Metal Workers Agreement since March 11, 1988." The board also requested the Agency "to audit all pertinent payroll records and documents of all employees of Roberts Heating and Air Conditioning."

To perform the audit, the Agency engaged C.P.A. Ronald J. Matasek. In June and August 1989, although Matasek sent two letters to Roberts demanding production of their payroll records to perform the audit, he received no response. Regarding the obligation of an employer to submit to an audit, the agreement states:

---

3. Kosiorek kept contemporaneous notes of his encounter.

"Whenever a payroll audit is authorized, the participating employer involved shall make available to the Trustees, or the qualified public accountant designated by them, its payroll books and records."

Eventually, after this action was filed and after the court granted plaintiffs' motion to compel discovery (Judgment Entry, Sept. 10, 1990), Roberts produced its payroll records and Matasek reviewed them.

Matasek's audit covered the period March 11, 1988, the date the agreement was signed, to December 31, 1989. Another audit, by the Agency's Robin Miller, extended the period at issue through May 31, 1990, the expiration date of the agreement. Both auditors reviewed employee time cards and individual employee earnings records and calculated the number of hours worked by each non-clerical hourly worker. Matasek noted that many employees were identified as "Sheetmetal," "Service," or "Installer," all job classifications covered by the agreement. Both auditors found substantial delinquencies, since Roberts had made contributions on none of its employees.

The auditors received no information to contradict their assumption that all hours worked by non-clerical hourly employees were covered by the agreement. Significantly, Roberts produced no evidence that any of the employees named in the audit did *not* work all of their hours at tasks covered by the agreement.

For the purpose of their audits, the auditors assumed that partners Robert and Larry Tate worked forty hours per week, excluding holidays, on covered work. The auditors found no record of the hours worked by the Tates and the Tates produced none. Robert Tate admitted he performed heating and air conditioning work for Roberts throughout his tenure with that business. Similarly, Larry Tate said he did residential and commercial service and installation work. Again, neither of the Tates produced any evidence rebutting the auditors' assumption that they worked forty hours per week in covered employment.

While the Agency relied on Matasek's audit to determine the number of delinquent *hours,* it performed its own calculations of the delinquent *amount.* The Agency's manager, Robin Miller, calculated the delinquency in several steps. First, Miller used Matasek's audit of employee hours and added a column to Matasek's worksheet to reflect the delinquent hours in each month. That monthly hour figure, and his own figures for the period he audited, were entered in the "Hours Worked" column of Schedule 1 of Miller's audit. He then multiplied the number of hours by the contribution rate set forth in the collective bargaining agreement. The contribution rates for the relevant periods were set forth in Schedule 2. Miller set forth Larry Tate's and Robert Tate's hours on Schedules 4 and 5, multiplied those hours by the applicable contribution rates, then entered the totals in the "Contributions Due" column of Schedule 1 after first subtracting the contributions already paid on the Tates. He found contribu-

tions of $54,911.54 owed on Roberts' employees and $41,619.32 owed on the Tates themselves, for a total of $96,530.86 in delinquent contributions.

In addition to requiring monthly contributions to various funds, the agreement also provides for liquidated damages when employers become delinquent:

"Contractors who become delinquent shall be obligated to pay $25.00 minimum or 1% of delinquent amount, whichever is greater, for each month delinquency exists."

In accordance with that formula, Miller calculated the liquidated damages owed, as of July 20, 1992, at $38,408.59. Miller also calculated interest owed in the amount of $31,873.04, figured at the rates charged by the Internal Revenue Service for delinquent taxes.

The Funds were charged and paid $850 for the cost of Matasek's payroll audit. The agreement provides:

"In the event the payroll audit discloses that the participating employer has not paid contributions as required by the underlying collective bargaining agreement or special agreement, the employer shall be liable for the costs of the audit."

Finally, the collective bargaining agreement provides that attorney fees will be paid by the delinquent employer:

"The employer agrees that should the Trustees of any of the several Trust Funds described in this agreement employ the services of an attorney to collect any delinquent payments, to force compliance with this agreement, or because the employer failed to submit to auditing as herein provided, the amount of reasonable attorney's fees incurred by the Trust Fund shall be paid by the employer in addition to all other contributions, costs, charges and fees set forth in this agreement."

The Agency, as the agent for the Funds, sought to recover the delinquent contributions, liquidated damages, interest, audit costs, attorney fees, and costs.

## CONCLUSIONS OF LAW

### JURISDICTION AND APPLICABLE LAW

This action was brought under Section 301 of the Labor Management Relations Act, Section 185, Title 29, U.S.Code. Section 301(a) provides that suits for "violation of contracts between an employer and a labor organization" may be brought in federal district court. *Id.* Under Section 301, courts have jurisdiction over suits to collect delinquent benefit contributions. *Carpenters Local Union v. W.D. George Constr. Co.* (C.A.6, 1986), 792 F.2d 64. The United States Supreme Court ruled long ago that the state courts have concurrent jurisdiction with the

federal courts over suits brought under Section 301. *Charles Dowd Box Co. v. Courtney* (1962), 368 U.S. 502, 82 S.Ct. 519, 7 L.Ed.2d 483. However, in such suits, state courts must apply federal substantive law, and where state law is incompatible with the principles of federal labor law, the former must give way to the latter. *Local 174, Teamsters v. Lucas Flour Co.* (1962), 369 U.S. 95, 104, 82 S.Ct. 571, 577, 7 L.Ed.2d 593, 599-600. The court stressed the need for uniformity throughout the country and noted that "the existence of possibly conflicting legal concepts might substantially impede the parties' willingness to agree to contract terms for final arbitral or judicial resolution of disputes." 369 U.S. at 104, 82 S.Ct. at 577, 7 L.Ed.2d at 599-600.

Plaintiffs have already succeeded on part of their claim. Plaintiffs sought to compel Roberts to submit to an audit of its payroll records. After this action was filed, pursuant to an order compelling the production of documents, Roberts submitted to the audit. Remaining unresolved is plaintiffs' claim that the defendants owe contributions and dues on behalf of themselves and other employees.

## *FORMATION OF THE AGREEMENT*

■ Clearly, a collective bargaining agreement was formed between the Union and the partnership, even though neither Robert nor Larry Tate personally signed the agreement. While it is entirely possible that Mary Tate, one of the signers of the agreement, was a partner whose act would bind the partnership, that finding is unnecessary for the court's conclusion. The agreement was executed by, at the very least, authorized agents of the acknowledged partners, Robert and Larry Tate. All of the Tates admitted that Robert and Larry Tate intended to enter into a collective bargaining agreement, and that the agreement was signed with their knowledge and at their request. The fact that Mechele Tate was a minor at the time is irrelevant for several reasons. First, while she may have lacked the legal capacity to form contracts on her own, she did not lack the capacity simply to follow her husband's direction to execute the contract on his behalf. Second, her signature was unnecessary to bind the partnership, since Mary Tate unquestionably had legal capacity and was authorized to sign for at least one of the partners. Whether as an actual partner or as merely the agent for a partner, Mary Tate had the authority and capacity to bind the partnership.

Because one partner may bind the other partners to an agreement, and because each partner becomes liable for the obligations of the partnership, the court finds that Robert and Larry Tate, individually and as partners, were parties to the collective bargaining agreement for all business conducted as Roberts Heating and Air Conditioning.

The court rejects any suggestion that Roberts did not enter into a valid agreement. Despite several conversations with the Union and the Agency, no one from Roberts ever denied becoming a party to the agreement. Moreover, the employer's conduct belied its current suggestion that it never became bound by the collective bargaining agreement. By letter dated March 7, 1989, Roberts reiterated its willingness to pay fringes, and the Tates confirmed their willingness to pay dues. In addition, Roberts continued to send contribution report forms to the Agency until April 1989 and made contributions as late as November 1988. Since the obligation to make such contributions must arise from a written agreement, Roberts obviously deemed itself a party to some instrument creating that duty to contribute. Section 186(c)(5)(B), Title 29, U.S.Code; *Cent. States Pension Fund v. Kraftco, Inc.* (C.A.6, 1986), 799 F.2d 1098, certiorari denied (1987), 479 U.S. 1086, 107 S.Ct. 1291, 94 L.Ed.2d 147. Since the collective bargaining agreement was the only document creating the obligation to contribute, Roberts' conduct clearly manifested an intention to abide and be bound by the terms of whatever agreement was in effect at the time. *Cent. States Pension Fund v. Behnke, Inc.* (C.A.6, 1989), 883 F.2d 454, 459–461.

## TERMS OF THE AGREEMENT—DELINQUENT HOURS

■ By its written terms, the collective bargaining agreement required contributions on all hours worked by all employees performing work covered by the agreement. Although the Tates pointed out that they were suspended from Union membership, an employer is obligated to contribute on behalf of all employees performing work covered by the agreement, whether or not the employees are union members. *Teamsters Local No. 348 Health & Welfare Fund v. Kohn Beverage Co.* (C.A.6, 1984), 749 F.2d 315, certiorari denied (1985), 471 U.S. 1017, 105 S.Ct. 2024, 85 L.Ed.2d 305.

■ Plaintiffs presented credible evidence of the hours worked in employment covered by the agreement with the Union. An independent accountant examined Roberts' payroll records and arrived at the total number of hours worked but unreported to the Agency. A number of the employees were characterized by Roberts on their time cards as "sheetmetal," "service" or "installer," all functions covered by the agreement. The audit excluded clerical workers, and there was no evidence that Roberts engaged in any business *other than* the fabrication, installation, and service of heating and air conditioning systems, all functions covered by the agreement. Under these circumstances, plaintiffs' audits were sufficient evidence to show the hours worked in covered employment as a matter of just and reasonable inference. *Brick Masons Pension Trust v. Indus. Fence & Supply* (C.A.9, 1988), 839 F.2d 1333, 1337–1338; *Combs v. King* (C.A.11, 1985),

764 F.2d 818, 825–827; *Anderson v. Mt. Clemens Pottery Co.* (1946), 328 U.S. 680, 687–688, 66 S.Ct. 1187, 1192–1193, 90 L.Ed. 1515, 1522–1524.

Once plaintiffs have shown the unreported hours in covered employment as a matter of just and reasonable inference, " '[t]he burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference.' " *Combs v. King,* 764 F.2d at 826, quoting from *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. at 687–688, 66 S.Ct. at 1192–1193, 90 L.Ed. at 1522–1524; *Brick Masons Pension Trust v. Indus. Fence & Supply,* 839 F.2d at 1337–1339. In this case, Roberts failed to offer any evidence that any of the hours worked by any of its employees were *not* in employment covered by the agreement. The employer apparently did not keep records of those hours, if any, even though such records were required to be kept by the Employee Retirement Income Security Act ("ERISA"), Section 1027, Title 29, U.S.Code. *United States v. S & Vee Cartage Co.* (C.A.6, 1983), 704 F.2d 914, 916–918, certiorari denied (1983), 464 U.S. 935, 104 S.Ct. 343, 78 L.Ed.2d 310; *Combs v. King,* 764 F.2d at 821–825.

Roberts similarly offered no evidence to rebut plaintiffs' inference that the Tate brothers worked forty hours per week in covered employment and kept no records indicating the hours they worked in covered and noncovered employment.

The court holds that because Roberts violated its statutory duty under ERISA to keep accurate records of covered and noncovered employment, and failed to otherwise come forward with specific evidence of the extent of noncovered work performed, the plaintiffs are entitled as a matter of law to recover contributions for all hours worked by Roberts' employees and for forty hours weekly by Robert and Larry Tate. As noted in *Brick Masons Pension Trust v. Indus. Fence & Supply,* 839 F.2d at 1338:

"An employer cannot escape liability for his failure to pay his employees the wages and benefits due to them under the law by hiding behind his failure to keep records as statutorily required." See *Noe v. R.D. Jones Excavating, Inc.* (S.D.Ohio 1992), 787 F.Supp. 759, where the court held an employer must contribute on *all* hours worked by employees, not just those in covered employment, and held that full-time employees (such as the Tates) are "presumed conclusively" to have worked a minimum of forty hours per week at work on which contributions are due. The court found the employer liable for *all* hours and applied the forty-hour presumption despite affidavits from employees that part of their time was spent on work not covered by the agreement. See, also, the following cases where courts required contributions for *all* hours worked, whether or not employees performed nonbargaining unit work in addition to covered employment: *Waggoner v. Dallaire* (C.A.9, 1981), 649 F.2d 1362; *Wag-*

goner v. William Radkovich Co. (C.A.9, 1980), 620 F.2d 206; *Waggoner v. C & D Pipeline Co.* (C.A.9, 1979), 601 F.2d 456.

Applying federal law, the court concludes that plaintiffs' audits accurately reflect the number of delinquent hours on which contributions should have been made.

## TERMS OF THE AGREEMENT—ORAL MODIFICATIONS

According to the testimony of the Tate brothers, Union agent Kosiorek orally modified the scope of Roberts' obligation to contribute by excluding certain jobs (noncommercial) or certain employees (everyone but the Tates) from the obligation to contribute. Even if true, those oral modifications would not defeat the Agency's claims against the Tates.

The Agency is the collection agent for a number of multi-employer employee-benefit funds jointly administered by representatives of labor and management. It is well settled that neither a union nor its representatives are agents of trust funds created by a collective bargaining agreement, and that the trust funds are distinct and independent entities, separate from the union that negotiates the collective bargaining agreement establishing such trust funds. *Lewis v. Benedict Coal Corp.* (1960), 361 U.S. 459, 80 S.Ct. 489, 4 L.Ed.2d 442; see, also, *Natl. Labor Relations Bd. v. Amax Coal Co.* (1981), 453 U.S. 322, 101 S.Ct. 2789, 69 L.Ed.2d 672. As envisioned by Congress, neither the Union, nor the employers contributing to the trust fund, are agents of the fund capable of binding the trustees to separate agreements.

Just as the trust funds are separate and distinct legal entities from the Union and the employer, the actions of the Union may not be used to defeat the claims of the trust funds. The defendants contend that the Union representative of Local 33 made an agreement with, or gave instructions to, the defendants regarding contributions to the trust funds that were contrary to the defendants' obligations under the collective bargaining agreement. As such, those oral modifications to the collective bargaining agreement did not bind the trustees. Even assuming, for the time being, that Local 33's business agent made such statements, the trustees are not bound to those oral modifications of the contract. *Cent. States Pension Fund v. Behnke, Inc.,* 883 F.2d at 459; *Cent. States Pension Fund v. Gerber Truck* (C.A.7, 1989), 870 F.2d 1148; *Robbins v. Lynch* (C.A.7, 1988), 836 F.2d 330; *Operating Engineers Pension Trust v. Giorgi* (C.A.9, 1986), 788 F.2d 620; *Abbate v. Browning–Ferris Industries* (C.A.3, 1985), 767 F.2d 52; *Lewis v. Seanor Coal Co.* (C.A.3, 1967), 382 F.2d 437, certiorari denied (1968), 390 U.S. 947, 88 S.Ct. 1035, 19 L.Ed.2d 1137; *NYSA–ILA Med. & Clinical Serv. v. Carco* (D.N.J.1985), 607 F.Supp. 1217.

In *Kemmis v. McGoldrick* (C.A.9, 1983), 706 F.2d 993, 996, an action to collect delinquent contributions, the court pointed out that "[a] collective bargaining agreement is not governed by the same principles of interpretation applicable to private contracts." The court noted that Section 302(c)(5) of the Labor Management Relations Act, Section 186(c)(5), Title 29, U.S.Code, "requires that the detailed basis on which such payments are made be set forth in writing." *Id.* The court reversed the lower court's reliance on the union's oral representations, concluding:

"The policy behind section 302(c)(5) requires that contract interpretation of fringe benefit provisions be confined to the written terms of the * * * agreement." *Id.*

The court observed that the employer "may have been misled by Local 12 representatives," but concluded: "Under the prevailing law, however, that does not affect his obligation to the employee benefit trusts." 706 F.2d at 997.

A case virtually identical to the present one is *Operating Engineers Pension Trust v. Moine Bros. Excavators, Inc.* (C.D.Cal.1986), 124 LRRM 2030, 1986 WL 15442. In that case to collect benefit contributions, the employer defended by alleging the union agent made two misrepresentations: (1) that the employer need not contribute on principal owners of the employer, and (2) that the employer need not contribute for the nominal number of other workers. For the reasons discussed above, the court held the employer liable for the contributions regardless of whether the union agent had made those representations.

Courts have similarly refused to consider the defense that the union agent misrepresented the effect of the agreement. In *Laborers Local 800 v. Pump House, Inc.* (C.A.11, 1987), 821 F.2d 566, the employer claimed, as here, that the union represented that the contract applied only to particular jobs and to particular employees. The court dismissed that defense, finding that a "fraudulent inducement" claim will not defeat the funds' right under the agreement to contributions for all jobs and all employees. Of like effect is *Noe v. R.D. Jones Excavating, Inc., supra,* 787 F.Supp. 759, holding that a fraudulent inducement defense, although available under Ohio law in other contexts, was not available in an action to collect benefit contributions under federal law.

This is not a case where the Tates did not understand the nature of their acts. They knew they were entering into a collective bargaining agreement with a union, they knew the agreement required benefit contributions, and they had ample opportunity to read and understand the agreement or seek counsel to help them understand. Although the Tates now claim they did not understand all of the terms of the agreement, they clearly knew they were forming a contractual relationship with a union and the terms of that relationship were described in a written document, a copy of which they received well before signing it.

In a case like this one, where the employers argued that they thought the agreement applied only to themselves as owners and not to their employees, the court said:

"[T]he fact that [the employer] did not fully understand the consequences of signing the agreements does not lead to the conclusion that there was no mutual assent and hence no contract." *Operating Engineers Pension Trust v. Cecil Backhoe Serv.* (C.A.9, 1986), 795 F.2d 1501, 1504.

As that court noted: "A party who signs a contract is bound by its terms regardless of whether he reads it or considers the legal consequences of signing it." 795 F.2d at 1505. In that case, as here, the employer contended the union agent misrepresented the scope of the agreement and misrepresented the employees to which it would be applied. The court rejected that defense, finding: "It is not a defense to claim that a union representative misrepresented the effect of signing an agreement." 795 F.2d at 1505.

The Union agent's representations, if any, are also excludable under the parol evidence rule. See *Lewis v. Owens* (C.A.6, 1964), 338 F.2d 740 (in action to collect benefit contributions, parol evidence rule prohibited jury from hearing employer's testimony concerning union's misrepresentations).

For all of these reasons, the court will not consider any oral modifications to the agreement, nor will the court deem the Union's representations, if any, to constitute a defense to the Agency's claim for contributions and other damages. As a result, the court concludes that Robert and Larry Tate, and each of them, are liable to the Agency for $96,530.86 in delinquent contributions, $38,408.59 in liquidated damages, $850 in audit costs, and plaintiffs' attorney fees, since the collective bargaining agreement explicitly required the defendants to pay those amounts. In addition, the Agency may recover $31,873.04 in interest, as authorized by *Bricklayers' Pension Trust Fund v. Taiariol* (C.A.6, 1982), 671 F.2d 988, and by the mandatory sanctions of Section 1132(g)(2)(B), Title 29, U.S.Code.[4] The Agency shall submit evidence of its attorney fees and costs within thirty days of this decision and the total amount of the defendants' liability will be set forth in a judgment entry.

---

4. "In any action under this title [ERISA] by a fiduciary for or on behalf of a plan to enforce [Section 1145, Title 29, U.S.Code, requiring employers to contribute to multi-employer plans] in which a judgment in favor of the plan is awarded, the court shall award the plan—(A) the unpaid contributions, (B) interest on the unpaid contributions, (C) an amount equal to the greater of—(i) interest on the unpaid contributions, or (ii) liquidated damages provided for under the plan * * *, (D) reasonable attorney's fees and costs of the action, to be paid by the defendant." Section 1132(g)(2), Title 29, U.S.Code.

## DEFENDANTS' COUNTERCLAIM

 In their counterclaim, the Tates alleged that the Union materially misrepresented their obligations under the collective bargaining agreement and they relied on those misrepresentations. For the reasons discussed above, the counterclaim must be dismissed as against the Agency because there was no evidence that the Agency or the benefit funds made any statements to the Tates before they entered into the agreement. On the other hand, the Tates did offer evidence that Union agent Robert Kosiorek made certain representations to them and they apparently now claim a right of indemnification against the Union if they are liable to the funds.

To succeed on their claim of fraudulent inducement, the Tates must not only prove that the Union agent materially misrepresented certain facts to induce them to enter into an agreement but must also prove that they relied on those representations and that their reliance was reasonable. In this case, the court concludes as a matter of law that the Tates' reliance could not be reasonable. According to their own admissions, they discussed the agreement in a restaurant, not in an atmosphere of intimidation and coercion. They took the agreement home, read it, and had several weeks to consider their actions. They voluntarily took the signed agreement to the Union hall and presented it to the Union. Under these circumstances, the Tates could not have reasonably relied on any oral statements at variance with the written terms of the agreement.

In *Operating Engineers Pension Trust v. Cecil Backhoe Serv.*, *supra*, 795 F.2d 1501, the employer claimed, as here, that it thought the agreement would not apply to its employees. Nevertheless, the court held that the union "owed Cecil no duty to disclose that the agreements would apply to employees of Cecil Construction Co." 795 F.2d at 1508. The court found the employer was "not entitled to indemnity." Similarly, in *Operating Engineers Pension Trust v. Moine Bros. Excavators, Inc.*, *supra*, 124 LRRM 2030, the employer claimed the union said it would not have to contribute on its employees or its principal owners. The court deemed any reliance on that statement to be "unreasonable" in light of the clear terms of the written agreement. This court agrees that the Tates could not have reasonably relied on Kosiorek's statements, given their opportunity to read the agreement and to seek counsel if they needed assistance.

 The defendants' fraudulent-inducement counterclaim must be rejected on additional grounds. Defenses or claims that attack the validity of the agreement, such as fraudulent inducement, must be raised in arbitration and considered by arbitrators, not by the courts. *Northwest Ohio Dist. Council of Carpenters v. B & N Acoustical Ceiling* (N.D.Ohio), No. 91CV–7101, unreported; *Sigety v. Axelrod* (S.D.N.Y.1982), 535 F.Supp. 1169; *Prima Paint Corp. v. Flood & Conklin Mfg. Co.* (1967), 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270.

In this case, the parties agreed to settle their differences through the grievance procedure, a procedure explicitly giving the employer, as well as the Union, the right to file grievances. The agreement also provided that "[g]rievances not settled * * * may be appealed by either party to the Local Joint Adjustment board." (Section 2, Article X.) The agreement finally provided that "[e]xcept in the case of a deadlock, a decision of a Local Joint Adjustment Board shall be final and binding."

There was no evidence that the Tates ever filed a grievance contesting the validity of the agreement or raising the issue of fraudulent inducement. As the court held in *Northwest Ohio Dist. Council of Carpenters,* "defenses that attack the validity of an agreement, such as fraud in the inducement, are to be considered by the arbitrator in the first instance, rather than by the courts." See, also, *Sigety v. Axelrod* (S.D.N.Y.1982), 535 F.Supp. 1169 (holding that court has no jurisdiction over employer's claim of fraudulent inducement and that arbitration was proper course). By failing to grieve and arbitrate their claim of fraudulent inducement, the Tates may not now seek recovery or indemnification on that claim. See *NDK Corp. v. Local 1550, United Food & Commercial Workers* (C.A.7, 1983), 709 F.2d 491 (finding that court lacked jurisdiction over employer's claim that union obtained collective bargaining agreement by fraud and false representation).

Not only did the Tates fail to pursue their claim through the grievance and arbitration procedure, but they failed to raise that claim after the Union invoked that procedure against them. The Local Joint Adjustment Board notified the Tates of a hearing to consider the Union's grievance. The Tates failed to appear at the hearing despite that notice and a reminder phone call the morning of the hearing. The Local Joint Adjustment Board, whose decision the parties agreed would be "final and binding," found that the Tates had indeed violated the agreement, a decision affirming the validity of the contract.

The court finds it unnecessary to resolve the dispute in the testimony about what the Union agent told the Tates. However, the court notes that defendants could not satisfy their burden of proving a material misrepresentation because, among other things, the Tates could not agree even between themselves about what Kosiorek purportedly had said. On the one hand, Larry Tate said Kosiorek authorized a "split shop," whereby benefit contributions would be due only on "commercial" jobs. On the other hand, Robert Tate did not say that Kosiorek waived contributions on *any* job type but instead said the Tates could do "union work * * * [*i.e.*] any place that a contractor and the people that are doing the work are union." Robert Tate said:

"I interpreted any time that I go to a job and there is other union contractors on that job, then my brother and myself should do that work."

Adding further confusion was Larry Tate's definition of "split shop" as one where the older, more experienced employees were Union members while the newer employees were not members.

Where the parties alleging fraud cannot agree on the specific representations allegedly made, the court cannot find that Kosiorek intentionally and materially misrepresented the terms of the agreement, especially when Kosiorek flatly denied those statements and the court found Kosiorek to be a credible witness.

WHEREFORE, IT IS ORDERED, ADJUDGED AND DECREED THAT:

1. Judgment is granted in favor of the plaintiff Sheet Metal Workers Local No. 33 Collection and Administration Agency, Inc. against defendants Robert Tate and Larry Tate, and each of them, for $96,530.86 in delinquent contributions, $38,408.59 in liquidated damages, $31,873.04 in prejudgment interest, and $850 in audit costs, for a total judgment of $167,662.49;

2. Plaintiffs shall also recover against the defendants and each of them the plaintiffs' costs and attorney fees, in amounts to be determined after plaintiffs' submission of a petition for fees and costs within thirty days of this entry; and

3. Defendants' counterclaim is dismissed.

*Judgment accordingly.*